THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KIM A. OVERLIN, Defendant-Appellant.

Fourth District   No. 4—92—0578

Opinion filed February 11, 1993.

Geisler Law Offices, of Decatur (Gary F. Geisler, of counsel), for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Following a jury trial conducted in the circuit court of Macon County, defendant Kim Overlin was found guilty of aggravated criminal sexual assault by placing his penis in the mouth of T.J.B., at a time when defendant was over 17 years of age and the victim was under 13 years of age. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1).) Defendant was sentenced to a term of imprisonment of 12 years.

The issues raised in this appeal are (1) whether defendant was proved guilty beyond a reasonable doubt of aggravated criminal sexual assault, and (2) whether the trial court committed an abuse of discretion by allowing into evidence testimony relating to prior misconduct by defendant. We affirm.

Defendant, a person 17 years of age or older, was charged by information with the offense of aggravated criminal sexual assault by placing his penis in the mouth of T.J.B., aggravated criminal sexual assault by placing his mouth on the penis of T.J.B., and aggravated criminal sexual abuse by fondling the sex organ of J.C. for the purpose of defendant's sexual arousal. (Ill. Rev. Stat. 1989, ch. 38, pars. 12—14(b)(1), 12—16(c)(1)(i).) The offenses were alleged to occur on or about June 1, 1990, through October 21, 1991. Defendant moved to sever the trial of the count involving J.C. from the counts involving T.J.B. For the date the motion was considered, the trial court's docket entry stated in relevant part: "As to defendant's motion to sever, People confess the same."

In an answer to defendant's motion for a bill of particulars, the State answered that the incident charged occurred at 1168 West King, Decatur, Illinois, in "late summer of 1990, a few weeks before school started."

T.J.B. testified he was born October 22, 1978. He had known the defendant for about three years and on occasion spent the night with his son, Tony. T.J.B. remembered defendant living in a yellow house by the mall north of Decatur and then moving to a house on King Street. The first time defendant approached T.J.B. and made him feel uncomfortable was at the yellow house. When they went to bed, defendant put his hand on T.J.B.'s testicles. T.J.B. just moved away. Nothing else happened that night. The testimony was allowed over defendant's objection that it was not relevant to show what happened at some other time and place. The next time defendant did something to make T.J.B. feel uncomfortable was at a campground near Lake Shelbyville. Defendant took a bunch of kids to go camping. After they went to sleep in the tent, defendant tried to rub his penis up to T.J.B.'s mouth. T.J.B. ran out of the tent. Defendant ran out after him saying, "It's all right if nobody knows." The final incident was at the King Street house, which is the basis for the present charges. This was about two years after the incident at Lake Shelbyville. T.J.B. had poison ivy and defendant came by T.J.B.'s house and told T.J.B. he had something that would cure it, something better than Calamine lotion. So T.J.B. went to defendant's house and took a bath. No one else was at the house. After he took a bath, T.J.B. lay down on a pallet defendant made for him on the floor. This was downstairs in a basement bedroom. After lying down with T.J.B., defendant then put T.J.B.'s penis into his mouth. Then he told T.J.B. to do it to him or he would tell everybody T.J.B. was gay. Defendant had his mouth on T.J.B.'s penis for about two minutes, and T.J.B. had his mouth on defendant's penis for 10 to 15 minutes. Defendant's penis was erect and he ejaculated. When T.J.B. ran into the bathroom and started gagging, defendant ran right in behind him saying "here is some toothpaste, and it will get the taste out of your mouth." Defendant told T.J.B. it was urine. Defendant threatened T.J.B. that if he told anybody, defendant would tell them T.J.B. was a homosexual. T.J.B. did not tell anybody for about a year, because he was afraid defendant would tell people he was a homosexual and they would believe him. When he finally told his friends and his mother, T.J.B. was 12 years old.

On cross-examination, T.J.B. testified further that on the occasion defendant took T.J.B. to the King Street house, defendant drove them there in his blue Oldsmobile. When they arrived, they went straight to the bathroom and ran the water and put the lotion in. At first, defendant tried to come into the bathroom, telling T.J.B., "you go ahead and take off your clothes. I ain't going to try anything." T.J.B.

refused to allow this and when defendant left, T.J.B. removed his clothes and took a bath. When he found out no one else was home, T.J.B. did not refuse to stay. After the bath, they went into a nearby bedroom where defendant placed a sheet and a cover down on the floor. There was a large bed in the room. T.J.B. thought he would be the only one sleeping on the floor, and he did not know what to think when defendant lay down beside him. Defendant had his underwear on. T.J.B. testified that, when defendant placed his mouth on T.J.B.'s penis, "I just laid there, freaked out, didn't know what to think." Defendant continued for a couple of minutes during which time T.J.B. did not say anything and did not ejaculate. Then defendant made T.J.B. do it to him. At first T.J.B. refused, but defendant threatened to tell everyone he was a homosexual. Afterward, T.J.B. spent the night there and went home the next day. He did not tell his mother, brother, friends or the police. At Halloween, T.J.B. went with defendant to the Jaycees' haunted house, and in January 1991, T.J.B. went to Chicago with defendant for a Bulls game. T.J.B. testified he tried to hide his fear. T.J.B. denied that defendant told him that T.J.B. could not stay at his home because T.J.B. had touched Tony.

When J.C. testified, he was 12 years old. His birthday was October 6, 1979. He was also a friend of Tony Overlin and had known him for about two years. He knows defendant is Tony's dad. J.C. spent the night with Tony Overlin about four times. The testimony of J.C. was admitted over defendant's continuing objection based on the lack of similarity between the incidents and that the evidence was not demonstrative of *modus operandi*, but would create in the jurors' minds an idea that defendant had a propensity to commit these kinds of crimes. The first time defendant did something to make J.C. feel uncomfortable was in the yellow house by the mall. Tony, his sister Tammi, and defendant were with J.C. J.C. had gone to spend the night. When they went to bed, J.C. went into Tony's room to sleep on a blanket on the floor. At that time, defendant did not have a wife. When Tammi started crying, defendant took her into his room and then came and lay on the floor by J.C. When he lay down, defendant "pushed me closer to him; and scooted up, had his front against my backside." (It is noted that on cross-examination, J.C. testified he slept through the incident.) J.C. then got up and went to the front room and stayed there for the night. There were about four other occasions when defendant made J.C. feel uncomfortable. He specifically remembered an incident at a white house near Decatur. Defendant was married then. That night everybody took a shower and J.C. was the last one. Defendant came in and told J.C. to wash his "private

spot." Defendant said he was going to give J.C. a bath. When defendant walked out, J.C. locked the door and got dressed. After he got dressed, they all went to bed. J.C. again slept on the floor in Tony's room. There was a bunk bed in Tony's room, but both beds were occupied by other children. This was a bedroom in the basement. Later, defendant returned to the room and slept next to J.C. Defendant kept getting closer and closer and put his hand around J.C.'s waist. Defendant put his hand on J.C.'s "private" and the front of defendant's body touched the backside of J.C.'s body. J.C. did not remember what happened after that.

J.C. further testified that at the time of the incident at the white house, defendant's wife was working. She was not there when they went to bed. J.C. did not go to the haunted house with defendant, but he did go to the Bulls game with defendant. The white house was the house on King Street.

Jeff Marlow, who was assigned to the Illinois State Police division of criminal investigation, testified concerning the reports by T.J.B. of sexual assault by defendant. At the time Marlow interviewed T.J.B., T.J.B. was 12 years old. T.J.B. reported incidents of fondling and receiving oral sex and being made to perform oral sex, all involving defendant. T.J.B. related an incident which occurred at Lake Shelbyville and another occurring at the address on West King Street in Decatur involving a medicated bath for poison ivy. The testimony of Marlow about these reports was substantially the same as T.J.B.'s testimony. Marlow stated he initially understood the oral sex incident occurred at a location on Twenty-First Street in Decatur. At the time of the arrest, Marlow advised defendant of the nature of the offenses for which he was arrested, and without any further questioning from Marlow, defendant started crying and explained to Marlow that he was aware of his problem and was seeking help for it. At the time the officers went to make the arrest on December 20, 1991, the officers were aware defendant was present in his home, but defendant would not come out of his residence for two hours even though the officers were knocking on the front and back doors and yelling at him to come out. Finally, the officers pried the back door open to get into the house.

On cross-examination, Marlow again testified that T.J.B. indicated the residence at which the oral sex occurrence took place was located on Twenty-First Street in Decatur and it was Marlow's impression that was where the incident occurred. No mention had been made of a residence on King Street. On redirect examination, Marlow was allowed to testify that through his investigation, he found out the inci-

dent occurred on West King Street. The Twenty-First Street address was where defendant lived with his wife, Sandra, and son and daughter and where she and the children still live.

Douglas Raver, a police officer for the City of Decatur, testified about J.C. identifying certain residences in which the incidents he related had occurred.

T.J.B.'s mother testified she first became aware of unwanted contact between defendant and T.J.B. in October 1991. She confirmed T.J.B. was a friend of defendant's son. Defendant took the children to church, camping, to Six Flags, and to the Bulls game. Defendant also brought her food when she needed help. On cross-examination, she stated she thought defendant was safe for T.J.B. to be around. T.J.B.'s brother, J.B., testified about the places defendant took the children and who went along. J.B. did not go on the camping trip or sleep over at defendant's house.

Darlene Thomas, a former wife of defendant, testified they were married on June 9, 1990. She lived at 1168 West King Street and defendant moved in there. She was not the mother of defendant's children. They did come for visits. Thomas' usual work hours were from 8 a.m. to 5 p.m. She could not recall any time during the summer of 1990 that she was not at home for the entire night. When Tony's friends were there, as far as she knew, the defendant's children were also there. She does work into the evening hours. She might have worked until 10 p.m. This only occurred if something unusual came up. She did not recall coming home one night and finding one of Tony's friends had spent the night at the house, but she admitted she would probably not have remembered it if it had happened. On cross-examination, Thomas admitted there were times defendant was there when she was not. When Tony's friends were over, she usually went to sleep before the boys went to bed. Defendant would be up with the boys. It is possible there were times she was gone all night.

Defendant's 12-year-old son testified that when they went camping near Lake Shelbyville, he and his sister slept next to his father. T.J.B. was punching and grabbing Tony in the private area. Tony did not see defendant touch T.J.B. or see defendant take out his "privates" in the tent. According to Tony, T.J.B. never spent the night at the King Street residence. On cross-examination, Tony stated he was living with his mother, and he would visit his dad every other weekend. At Lake Shelbyville, when they went camping, his sister slept next to defendant because she was scared. The first time Tony told his dad about T.J.B. punching him was about a month ago, and he did

not know if T.J.B. was doing it accidentally or meant to do it. On re-direct, Tony stated defendant never set up a bed on the floor in his bedroom and slept on it. On re-cross-examination, Tony admitted defendant did set up such beds on the floor in Tony's room for Tony's friends who spent the night.

Defendant's daughter, Tammi, eight years old, testified that at Lake Shelbyville, she slept between her dad and her brother. T.J.B. slept on the other side of Tony. She remembered because they rolled a lot and she was scared. She never saw defendant touch T.J.B. She also did not remember a night when T.J.B. slept at the King Street residence. On cross-examination, she testified she would have been about six or seven at the time they went to Lake Shelbyville.

Defendant testified T.J.B. did not come and spend the night at the King Street house. Defendant did not want T.J.B. around his children. He denied T.J.B. came to the house when the children were not there. Defendant said he did not know about T.J.B. having poison ivy, nor did he know anything about a medicated bath. He went to Lake Shelbyville to spend the night with the children and some of their friends before July 30, 1989. The floor of the tent was eight feet by eight feet. Defendant slept on the side with Tammi next to him because she was scared from the ghost stories. He did not sleep next to T.J.B. and tried to stay away from him because he was dirty and had scabies. Nothing happened between T.J.B. and defendant that night. T.J.B. never spent the night at the house on King Street because on the camping trip defendant saw T.J.B. do something he was not sup-posed to do. T.J.B. was lying next to a child named Joey and had fon-dled him and had done something with his penis on Joey's front. Defendant confronted T.J.B. about this in the morning. T.J.B never spent the night with defendant or his children again, although defend-ant still helped T.J.B.'s family and took him on other excursions. Dur-ing the summer of 1990, there was no time when his wife, Darlene, was gone the entire evening. She might have been gone for some of the evening hours to go to church or something like that.

On cross-examination, defendant stated he told T.J.B.'s mother about T.J.B. doing something to Joey over two years ago. She said she would take care of it. He denied telling Marlow, "I know what my problem is, and I'm getting help." Instead, defendant testified Marlow asked him "you got a big problem, don't you?" and defendant responded, "You referring to this arrest?" and "Yeah, I've got a prob-lem." He denied saying anything about getting help. On redirect ex-amination, defendant testified nothing happened between himself and T.J.B. or himself and J.C.

T.J.B.'s mother was called by the State to testify in rebuttal. She denied defendant ever told her anything about seeing her son touch anyone in an inappropriate manner.

The first issue to be considered is whether the trial court committed an abuse of discretion by allowing into evidence testimony relating to prior misconduct by defendant. Defendant complains that the trial court should not have allowed T.J.B. to testify about prior incidents and particularly the one at Lake Shelbyville. Defendant also argues it was reversible error for the trial court to allow J.C. to testify about incidents with defendant.

The question of T.J.B. testifying can be disposed of easily. In *People v. Cregar* (1988), 172 Ill. App. 3d 807, 821-22, 526 N.E.2d 1376, 1386, this court stated:

> "[E]vidence of other sexual acts with a complainant in an indecent liberties case is admissible to show the relationship and familiarity of the parties and to corroborate the complaining witness' testimony concerning the offense charged. (*Esterline*, 159 Ill. App. 3d 164, 512 N.E.2d 358; *Bradley*, 128 Ill. App. 3d 372, 470 N.E.2d 1121.) The evidence is admissible even though the fact that the parties had a continuing relationship or knew each other is not at issue. The evidence shows the intimacy of the relationship. (*People v. Arbuckle* (1979), 75 Ill. App. 3d 826, 393 N.E.2d 1296.) Evidence of the relationship between complainant and defendant was admissible."

Therefore, T.J.B.'s testimony is admissible.

The questions surrounding J.C.'s testimony are a little more difficult. The theory under which the evidence was offered at trial was to show a *modus operandi.*

> "The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not be overturned on appeal absent a clear abuse of discretion. (*People v. Franklin* (1990), 135 Ill. 2d 78, 96; *People v. Brown* (1990), 199 Ill. App. 3d 860; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481.) Such an abuse of discretion will be found only where the trial court's decision is ' "arbitrary, fanciful or unreasonable" ' or ' "where no reasonable man would take the view adopted by the trial court." ' (*People v. M.D.* (1984), 101 Ill. 2d 73, 90, quoting *Peek v. United States* (9th Cir. 1963), 321 F.2d 934, 942.)" (*People v. Illgen* (1991), 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519.)

As the briefs of the parties demonstrate, the principle relating to the admissibility of evidence of other crimes has been discussed in a number of cases.

"The law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime. And so, as a matter of policy, where the testimony has no value beyond that inference, it is excluded. But where the evidence is independently relevant it is admissible as, for example, where it shows motive or intent, identity, absence of mistake or accident, or the existence of a common scheme or design." (*People v. Lehman* (1955), 5 Ill. 2d 337, 342-43, 125 N.E.2d 506, 509.)

Evidence of other crimes may be admitted to show *modus operandi*. *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 824.

In arguing whether the applicable degree of similarity between the charged offense and the other crimes which must be present in order for the evidence of the other crimes to be admissible, the State notes that the similarity to establish *modus operandi* is not as high in degree as in cases where the theory supporting admissibility is to show a common scheme. In *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 486-87, 485 N.E.2d 1292, 1297, cited by both parties, the relationship was discussed as follows:

"*Modus operandi* and common design, scheme or plan are distinct concepts, and therefore they are not interchangeable bases for the admissibility of evidence of other crimes. Different principles are applicable to each. *People v. Barbour* (1982), 106 Ill. App. 3d 993, 999, 436 N.E.2d 667, 672.

A common design, scheme or plan refers to a criminal scheme of which the crime charged is only a part. (*People v. Barbour* (1982), 106 Ill. App. 3d 993, 999-1000, 436 N.E.2d 667, 672.) If evidence of other crimes is offered to establish that the crime charged was part of a common design, scheme or plan of defendant, there must be a high degree of identity between the facts of the crime charged and those of the other crime. The two crimes must be so similar that evidence of the other crime tends to prove defendant guilty of the crime charged. The reason this similarity is required is that defendant's participation in the crime charged may be inferred from his involvement in the other crime. *People v. McKibbins* (1983), 96 Ill. 2d 176, 185-86, 449 N.E.2d 821, 825.

*Modus operandi* means, literally, 'method of working.' It refers to a pattern of criminal behavior so distinct that separate

crimes, or wrongful conduct are recognized as the work of the same person. (*People v. Barbour* (1982), 106 Ill. App. 3d 993, 1000, 436 N.E.2d 667, 672.) If evidence of other crimes is offered to prove *modus operandi*, there must be some clear connection between the other crime and the crime charged which creates a logical inference that if defendant committed one of the acts, he may have committed the other act. This inference of identity does not arise from the mere fact that the crime charged and the other crime share certain common features or marks of similarity, for it may be that these similarities are shared not only by the crime charged and defendant's other crime, but also by numerous distinct crimes committed by persons other than the defendant. Rather, the inference is created when both crimes share peculiar and distinctive common features so as to earmark both crimes as the handiwork of the defendant. (*People v. Matthews* (1985), 137 Ill. App. 3d 870, 875-76.) There must be some distinctive features that are not common to most offenses of that type. (*People v. Dickerson* (1983), 119 Ill. App. 3d 568, 574, 456 N.E.2d 920, 925.) While there must be a strong and persuasive showing of similarity between the other crime and the crime charged to satisfactorily demonstrate *modus operandi* (*People v. Barbour* (1982), 106 Ill. App. 3d 993, 1000, 436 N.E.2d 667, 672), it is not necessary that the crimes be identical for the other crime to be admitted in evidence to prove *modus operandi*. *People v. Anderson* (1982), 108 Ill. App. 3d 563, 570-71, 439 N.E.2d 65, 70; *People v. Lewis* (1983), 115 Ill. App. 3d 389, 394, 450 N.E.2d 886, 894, *rev'd on other grounds* (1984), 103 Ill. 2d 111, 468 N.E.2d 1222."

Generally, proof of *modus operandi* is used to establish the identity of the perpetrator. In the case at bar, the question of the identity of the perpetrator was not really an issue.

It has also been said that evidence of *modus operandi* may be used, not only to show who committed the crime, but whether a crime was committed at all (*People v. Brown* (1991), 214 Ill. App. 3d 836, 845, 574 N.E.2d 190, 195-96; *People v. Middleton* (1976), 38 Ill. App. 3d 984, 990, 350 N.E.2d 223, 228), although *Middleton* appears to have considered *modus operandi* and common scheme to be interchangeable concepts. Evidence of other crimes may not be introduced for the sole purpose of bolstering the credibility of a prosecution witness. (*People v. Romero* (1977), 66 Ill. 2d 325, 329-32, 362 N.E.2d 288, 289-91.) One commentator has suggested that the *Middleton* decision

stands for the proposition that evidence of other crimes is admissible "to show plausibility of complainant's allegations." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §404.5, at 192 (5th ed. 1990).) However, if the evidence was admitted in *Middleton* simply to support complainant's "plausibility," in order to apply *Middleton* to this case, while still following the proscription of *Romero*, would require this court to walk such a fine line as to be tantamount to performing a high-wire act. The court in *Middleton* pointed out that the evidence tended to refute a correctly anticipated defense. *Middleton*, 38 Ill. App. 3d at 990, 350 N.E.2d at 228.

■ *Middleton* does make a valid point that where the defendant denies committing the crime charged or denies that it could have occurred in the particular manner alleged, evidence of *modus operandi* may be admitted to establish that a crime occurred. In the case at bar, the evidence is relevant to establish the methodology of how defendant operated in attempting to seduce victims. This evidence tends to establish that the crime charged did occur. The evidence is admissible even though it also incidentally bolsters the victim's testimony, and the probative value of this evidence outweighs the prejudice to defendant.

The parties cite a number of cases in which the similarities between the crimes charged and the evidence of other crimes either was or was not sufficient for admissibility in those cases. However, the Illinois Supreme Court has recognized that there will always be some dissimilarity between independent crimes. (*People v. Phillips* (1989), 127 Ill. 2d 499, 521, 538 N.E.2d 500, 508.) The defendant's contention here is that there is insufficient similarity between the crime charged and the evidence of the other crimes to warrant admission of the evidence.

In comparing the incidents testified to by J.C. and the crime charged, each involved defendant making a pallet for the child to lie on and lying down on the floor with the child. Both children were males, similar in age and friends of defendant's son. Defendant befriended the children in the same ways, taking them to basketball games, camping trips, and having them spend the night with his children. Although only the crime charged involved oral sex, this is not a sufficient dissimilarity to render the evidence inadmissible. (See *People v. Williams* (1989), 185 Ill. App. 3d 840, 853-57, 541 N.E.2d 1175, 1184-87 (and the cases cited therein).) J.C. did testify to a touching of his "privates." The instant crime involved T.J.B. taking a bath, and J.C. testified to an incident where defendant threatened to wash the child after defendant told him to make sure to clean his "private."

There are sufficient similarities to warrant the admission of J.C.'s testimony into evidence, and no abuse of discretion occurred.

■ The remaining issue to consider is whether defendant was proved guilty beyond a reasonable doubt of aggravated criminal sexual assault. In *People v. Schott* (1991), 145 Ill. 2d 188, 203, 582 N.E.2d 690, 697, the Illinois Supreme Court ruled that the standard of review for determining the sufficiency of the evidence in sex offense cases was the same as in other types of criminal cases and was articulated in *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77. In *Schott*, the court stated as follows:

> "We find that where the evidence is claimed to be insufficient on review, regardless of the nature of the evidence, the reasonable doubt test set forth in *Collins* should be applied. According to *Collins*, 106 Ill. 2d at 261, criminal convictions are not to be overturned on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. The test to be employed on review ' "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789." *Schott*, 145 Ill. 2d at 203, 582 N.E.2d at 697.

As charged in this case, the offense of aggravated criminal sexual assault occurs when a person 17 years of age or older commits an act of sexual penetration on a person who was under the age of 13 at the time the act was committed. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1).) Sexual penetration is defined as follows:

> "any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." Ill. Rev. Stat. 1987, ch. 38, par. 12—12(f).

Defendant points to the contradictory evidence and minor inconsistencies in an attempt to convince this court to overturn the defendant's conviction. However, T.J.B.'s testimony was solid, and he was not shaken on cross-examination at all. Defendant's ex-wife testified she might have been out of the house. Defendant's children were not

always there. Defendant denied it ever occurred and that T.J.B. was ever at the house on King Street. Therefore, it comes down to a matter of credibility. The jurors believed T.J.B., and there is nothing inherently incredible about T.J.B.'s version. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

For the foregoing reasons, the judgment of the circuit court of Macon County is affirmed.

Affirmed.

KNECHT and LUND, JJ., concur.