THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK S. ALLEN, Defendant-Appellant.

Fourth District No. 4—00—0786

Opinion filed December 10, 2002.

774

MYERSCOUGH, P.J., specially concurring.

Daniel D. Yuhas and Keleigh L. Biggins, both of State Appellate Defender's Office, of Springfield, for appellant.

John P. Schmidt, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Kathy Shepard, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE TURNER delivered the opinion of the court:

In February 2000, the State charged defendant, Mark S. Allen, with aggravated unlawful restraint (720 ILCS 5/10—3.1(a) (West 2000)) and aggravated kidnaping (720 ILCS 5/10—2(a)(5) (West 2000)). After a July 2000 trial, the jury found defendant guilty of both charges. At a joint hearing in September 2001, the trial court denied defendant's posttrial motion and sentenced him as a habitual criminal under section 33B—1 of the Criminal Code of 1961 (Code) (720 ILCS 5/33B—1 (West 2000)) on the aggravated kidnaping conviction to life in prison without the possibility of parole.

Defendant appeals, arguing (1) he was denied a fair trial because the State improperly used other-crimes evidence to show propensity to commit crimes, (2) the prosecutor made improper statements in his closing argument, and (3) his enhanced sentence based on his habitual criminal status is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirm.

## I. BACKGROUND

The victim in this case, Kristi L., a 14-year-old Lanphier High School student, gave the following testimony as to the events that occurred on January 18, 2000. School ended at 3:12 p.m., and Kristi talked with a friend for about 15 to 20 minutes after school. On cross-

examination, she testified she then spent an additional 5 to 10 minutes trying to get a ride home with a friend. After talking with the friend, she left the school and began walking home. As she walked, she noticed a purple truck in the basketball-hoops parking lot.

The truck eventually left the lot and pulled up alongside her. A man inside the truck asked if she knew of a street, and she replied no. The man then asked if she needed a ride home. Kristi said no and kept walking. The truck then pulled into a driveway and appeared to be leaving.

As Kristi continued to walk, she heard the truck stop behind her and then someone asked her to come here. She again said no and kept walking. Then the man came up behind her, put a knife to her throat, and asked her if she wanted this. The knife was about five to six inches long. She said no, and the man told her to get into the truck. He put his arm around her with the knife to her throat and walked her to his truck. The man put her in the passenger side of the truck and then got in the driver's side. She asked him not to hurt her, and he told her not to worry because he would not hurt her.

The man then drove around the area for about 15 to 20 minutes without saying a word. He eventually asked her where she lived, and she replied 17th Street. He then went to a wrong portion of 17th Street, and when she informed him her home was near Fairview Park, he took her directly to 17th Street and Griffith Street in Springfield, Illinois, which was near her home. He slowed down the truck, and when she heard the door unlock, she jumped out and ran home.

Her sister, Lindsey Lanham, was at home when she arrived. Kristi called her mother, Linda Campbell, at work and told her what happened. Kristi's stepfather, Jody Campbell, arrived home, and upon hearing what happened, called the police.

Kristi went to the police station several times after the January 18, 2000, incident. On one occasion, she looked at several mug shot books but found no photograph of the man who had assaulted her. Defendant's photograph was not among the mug shots in the books. On February 4, 2000, Detective Stephen Pellegrini presented Kristi with a photographic lineup with six men. Kristi picked out the picture of defendant but stated she was unsure and would like to see him in a lineup. On February 8, 2000, Kristi again went to the police station to view a lineup. She identified defendant in the lineup as the man in the truck. The next day, she identified defendant's truck. At trial, Kristi identified defendant as the man who forced her into his truck.

The State charged defendant as stated. On April 21, 2000, defendant filed a motion *in limine*, seeking to prohibit introduction of the nature of the aggravated criminal sexual assault conviction (People

v. Allen, No. 90—CF—627 (Cir. Ct. Sangamon Co.)) for which he was on an electronic monitoring device on January 18, 2000.

The trial court held a hearing on defendant's motion *in limine* at which *voir dire* of Victoria (Vicki) T., the victim of the 1990 crime, was allowed. Vicki testified that on September 8, 1990, she was employed at Scampi's, which was located at Second Street and North Grand Avenue in Springfield, Illinois. At the time, Vicki was 19 years old. She got off work at 3 p.m. and began walking to her boyfriend's home at 2335 North Fourth Street. As she was walking in a parking lot, she noticed a maroon and silver Chevy Caprice Classic slowed down behind her. A man stopped the car alongside her and stepped out of it. The man was carrying a knife about six to eight inches in length. The man put the knife to her throat and told her to get into the car. The man drove the car, holding Vicki close to him with the knife to her throat. While driving, the man told her was not going to hurt her, just rob her. Vicki noticed what "appeared to be a plastic silver pistol" on the passenger side floor. After about five minutes of driving, they went to a wooded area. The man made her take off her clothes, and then he sexually assaulted her. After he assaulted her, he first told her she could just leave but then told her to get back in the car. He then drove around the woods until she was lost. Vicki identified defendant as the man who assaulted her.

After comparing Vicki's testimony with Kristi's January 18, 2000, statement to the police, the trial court found the evidence of the prior crime admissible except for the sexual assault portion of the crime. The court noted the testimony went to *modus operandi*, and it was applying a less-stringent degree-of-identity standard between the two crimes because the evidence went to state of mind and not identity. At trial after the State's evidence, the trial court outside the presence of the jury noted it had reevaluated its ruling on the motion, applied the more stringent standard, and found the evidence still admissible.

At the July 2000 trial, the State first called Lindsey. Lindsey testified that on January 18, 2000, she was talking on the phone when her sister came in crying at about 4:25 p.m. Kristi told her to get off the phone and lock all the doors. Lindsey did as requested, and Kristi called their mother. Lindsey and Kristi's stepfather arrived home shortly thereafter.

Linda next testified that in January 2000, she was at work when a coworker told her that her daughter was on the phone crying and something was wrong. The call was at approximately 4:25 p.m. Linda had a difficult time understanding Kristi because of the crying but understood someone had picked Kristi up after school at knifepoint and put her in a truck. Linda left work immediately and arrived

home 10 to 15 minutes later. Kristi told her mother again someone had put her in a truck at knifepoint on her way home from school. Kristi stated the truck had a Christmas tree in the back. The police then arrived and asked Kristi questions about the incident. Linda testified Kristi gave the police a description of the man, including the fact he was wearing a brown coat.

Jody then testified he generally worked 8:30 a.m. to 4:30 p.m. When he arrived home on January 18, 2000, at his normal time, he began unloading his truck, and Kristi came to the door crying hysterically and told him to come in because she had something to tell him. Jody went in the house, and Kristi told him a man had forced her in a truck at knifepoint on the way home. Jody told her to calm down, sit on the couch, and try to remember everything she could. Jody then called the police. Jody then asked Kristi what she remembered. She said the truck was purple and the last two letters of the license plate were "SU." Kristi described the man as in his fifties and short. Jody testified the police arrived about 45 minutes after his phone call.

Springfield police officer April Smiddy next testified that on January 18, 2000, at a little before 5 p.m., she received a call regarding a kidnaping. She responded to the call and ascertained the victim was Kristi. She then discussed with Kristi what had happened. Kristi described how she was forced into a truck at knifepoint on her way home from school. Kristi described the knife as a pocketknife. Kristi also stated she had been driven around by the man for 25 to 30 minutes and that the offense occurred between 3:30 p.m. and 4:15 p.m. Kristi described the man as in his midfifties with medium-length gray hair, approximately 5 feet 5 inches, and medium build. The man also had glasses with a sunglasses clip on them. She described the truck as an unusual purple color; with a stick shift, bucket seats, an air freshener with an Indian head on it hanging from the rearview mirror, and a Christmas tree in the back; and the last letters of the license plate were "SU."

Matthew Lukow testified he had seen defendant drive a purple Ford Ranger on several occasions. On January 15, 2000, Lukow had seen defendant's truck parked in front of his home with pine branches sticking up about two feet from the truck bed.

Detective Pellegrini testified he was assigned to investigate the kidnaping case. On January 21, 2000, he interviewed Kristi and had her examine mug shot books. Kristi did not identify anyone in the books. On February 1, 2000, Detective Pellegrini went to defendant's place of employment and noticed a pickup meeting the description given by Kristi. On February 4, 2000, he conducted a photographic lineup of six men. After looking at the pictures for several minutes,

Kristi selected defendant but requested to see him in a physical lineup. On February 8, 2000, Detective Pellegrini conducted a physical lineup. Kristi looked at all the individuals and immediately identified defendant as the man who kidnaped her at knifepoint.

Defendant's truck was confiscated. The truck's bed contained pine needles. The truck's license plate was "8175SU." Kristi identified the truck.

Vicki then gave testimony similar to that at the hearing on the motion except the sexual assault was not mentioned. She identified defendant as the man who forced her into the car.

Defendant first presented the testimony of Marvin Knapp, defendant's supervisor at Owens and Miner. Knapp explained the company's time clock. Knapp testified the payroll sheet indicated that on January 18, 2000, defendant clocked in at 7:17 a.m. and clocked out at 3:49 p.m. After 4 p.m., he saw Randy Frederick and Charles "Tom" Stewart talking in the parking lot but did not see defendant.

Charles Dick, Jr., a worker at Owens and Miner, testified he worked from 7:30 a.m. to 4 p.m. on January 18, 2000. On that day, defendant was training him. Dick did not recall seeing defendant leave.

Stewart testified that on January 18, 2000, he talked with defendant and Frederick in the parking lot at Owens and Miner from 3:50 p.m. to 4 p.m. Defendant was in his truck during the conversation. Stewart stated defendant had clocked out at 3:49 p.m., he followed defendant out, and then went back in at 4 p.m. to clock out. As he was leaving, he saw defendant heading west on Sangamon Avenue. Stewart further testified defendant did not have a Christmas tree in the back of his truck. He also testified defendant was wearing jeans and a flannel shirt with a liner.

Frederick gave similar testimony that defendant clocked out at 3:49 p.m. while he and Tom clocked out at 4 p.m. He stated the three had started their vehicles and then walked back to the door where they talked until 4 p.m. Frederick stated the last time he saw defendant on January 18, 2000, was when defendant was getting on Interstate 55 off Sangamon Avenue. According to Frederick, he and Tom had tried to get defendant to go to a bar after work, but defendant had declined, stating he had to be home by 5 p.m. because his stepdaughter had school. Frederick also testified defendant was wearing blue jeans and a blue plaid insulated flannel shirt. He did acknowledge defendant used to wear a brown jacket before he got the blue shirt.

Defendant's wife, Sue Allen, testified on January 18, 2000, the truck did not contain a Christmas tree. She also testified January 18,

2000, was a Tuesday and dinner was at 5 p.m. on Tuesdays and Thursdays because of her daughter's school. She stated defendant arrived home around 4:40 p.m. that day. He was wearing black shoes, a flannel shirt, a colored T-shirt, a baseball hat, and a blue plaid insulated jacket. She also testified the locks on the truck's doors were manual.

Defendant's stepdaughter, Stacy Jack, stated she had school on January 18, 2000, at 6 p.m., and thus her mother had dinner at 5 p.m. She stated defendant arrived home between 4:40 p.m. and 4:45 p.m. On that date, defendant had a full mustache and goatee.

Norville Melton, an evidence technician for the Springfield police department, testified he processed defendant's truck. Melton lifted some fingerprints from the truck and vacuumed the car for possible hair and fiber samples. He then sent the fingerprints and the filters from the vacuum to the crime lab for analysis. He stated he was informed no matches were established with the fingerprints.

Terry Lowe, a private detective, testified on July 10, 2000, he drove starting at 4:05 p.m. from defendant's work to GB Oil and then to defendant's home. The trip was 10.2 miles and took 32 minutes. On May 16, 2000, he took a different route from GB Oil to defendant's house. On that date, the time to get from GB Oil to defendant's house was six minutes less.

Kenneth Knight, a forensic scientist with the Illinois State Police Crime Lab, testified none of the hairs collected in the filters belonged to Kristi. Further, no hairs were found on the clothes Kristi was wearing and the book bag she was carrying on January 18, 2000.

In rebuttal, Springfield police department detective Amy Langster testified she drove both routes driven by Lowe and both took 21 minutes. She began the first trip at 4:04 p.m. and the second at 4:43 p.m. She also drove from defendant's work to Lanphier High School, past some of the streets Kristi mentioned, to where Kristi was dropped off, and then to defendant's home. That trip took 22 minutes. On another date, Detective Langster drove from defendant's work to the parking lot with the basketball hoops, and that trip took 11 minutes.

The jury found defendant guilty of both charges. On July 13, 2000, defendant filed a posttrial motion. On August 9, 2000, the State filed a statement as to defendant's habitual offender classification. At a September 2000 hearing, the trial court (1) denied defendant's posttrial motion, (2) found defendant was a habitual criminal, and (3) sentenced him to life imprisonment without parole on the kidnaping conviction. The trial court also denied defendant's motion to reconsider sentence. This appeal followed.

## II. ANALYSIS

### A. *Modus Operandi*

Defendant first argues he was denied a fair trial because Vicki's testimony was inadmissible other-crimes evidence. The State primarily argues the evidence was admissible under the *modus operandi* exception.

The prosecution generally may not show a defendant committed another crime, in an attempt to prove he committed the crime charged. *People v. Biggers*, 273 Ill. App. 3d 116, 122, 652 N.E.2d 474, 478 (1995). Yet, evidence of other crimes is admissible where relevant for a purpose other than to show the propensity to commit crime, including *modus operandi*. *People v. Rohlfs*, 322 Ill. App. 3d 965, 968, 752 N.E.2d 499, 501 (2001). However, the fact two crimes involve the same *modus operandi* does not justify admission where no question about identity, or intent-lack of mistake, is presented. *Biggers*, 273 Ill. App. 3d at 123, 652 N.E.2d at 479. Identity is in issue whenever a defendant denies he was the perpetrator. *Biggers*, 273 Ill. App. 3d at 124, 652 N.E.2d at 479.

Here, defendant presented an alibi defense, asserting he was not the perpetrator. While at the hearing on the motion *in limine* the trial court determined the *modus operandi* evidence was not going to identity and the State agreed, the trial court reevaluated its ruling on the motion after hearing some of the testimony presented at trial. A motion *in limine* remains subject to reconsideration by the court throughout the trial. *Schuler v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 334, 729 N.E.2d 536, 543 (2000). In reevaluating the order on the motion *in limine*, the trial court noted it better understood the nature of the prosecution and the defense and then applied the more stringent standard of similarity. Courts apply a more stringent standard of similarity when the State uses *modus operandi* evidence to prove identity. *People v. Butler*, 31 Ill. App. 3d 78, 80, 334 N.E.2d 448, 450 (1975); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 404.5, at 227, 229 (7th ed. 1999). Thus, contrary to defendant's argument, the trial court did not admit the other-crimes evidence solely for the purpose of showing the two crimes had the same *modus operandi*.

Defendant further contends the other-crimes evidence was inadmissible because the two offenses did not bear a high degree of similarity. To prove identity, a strong and persuasive showing of similarity between the charged crime and the other-crimes evidence must be present. A high degree of similarity is required because proving identity under a *modus operandi* theory involves reliance on the

inference that a distinctive pattern of criminal activity earmarks the crimes as the work of a particular individual or group. However, the test is not one of exact, rigorous identity because some dissimilarity will always exist between two independent crimes. *People v. Robinson*, 167 Ill. 2d 53, 65, 656 N.E.2d 1090, 1095 (1995).

Where definite distinctive links between the two crimes exist, the link would outweigh a number of dissimilarities. However, if no particular factor was unique and the totality of the circumstances was probative, a few dissimilarities may destroy the effect of the similarities. *Biggers*, 273 Ill. App. 3d at 123, 652 N.E.2d at 479.

The State points to the following similarities: both crimes occurred about the same time in the same area of Springfield, both victims were young females and were walking, both were followed by a vehicle from which a man alighted, the man held a knife to the throats of both victims, both victims were forced into a vehicle, both victims were driven around and eventually released, and both victims identified defendant as the perpetrator.

Defendant notes the dissimilarities: the crimes occurred 10 years apart; the ages of the victims; the type of vehicle; the way the perpetrator approached the victims; the length and type of knife; the manner in which the perpetrator treated the victim while he drove; a pistol was in the vehicle in the other crime but not in the charged crime; and defendant drove Vicki to a wooded area, sexually assaulted her, and then abandoned her outside of the city, while the man in the charged crime drove the victim around and then dropped her off near her home.

■ We do not find the two crimes so distinctive as to "earmark" them as the work of a single individual. The fact the victim of the other crime was assaulted while the victim in the charged crime was unharmed is a substantial dissimilarity. Moreover, the manner in which the perpetrator approached the victims, treated the victims during the crimes, and released the victims was different. Additionally, most of the similarities are general in nature, *i.e.*, using a knife to force an individual who is walking alone into a vehicle. In this case, dissimilarities destroyed the effect of the similarities.

Because the evidence of the other crime was admitted but was not sufficiently similar to establish *modus operandi*, its admission under that exception was error.

Additionally, our colleague's special concurrence warrants comment. The special concurrence fails to acknowledge that the State did not seek to admit evidence of the sexual assault of the first crime, and the court did not allow the admission of such evidence. Presumably, neither the State nor the trial court could conceive of how this

evidence so dissimilar to the second offense could be admissible in the *State's case in chief.* Neither can we. We cannot agree with our colleague that carving out the dissimilarities of the prior offense to make it similar to the present offense renders the similarities admissible under *modus operandi.*

In passing, the State remarks the other-crimes evidence also went to state of mind. As stated, defendant's defense was alibi. The State does not suggest how the other-crimes evidence went to defendant's state of mind in this case. Thus, the other-crimes evidence was not admissible under the state of mind exception.

The State argues any error in admitting the other-crimes evidence was harmless. While the erroneous admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different. *People v. Hall,* 194 Ill. 2d 305, 339, 743 N.E.2d 521, 541 (2000).

Defendant argues his conviction must be reversed because it was a propensity-based conviction. In support of his argument, he points to two instances where the prosecutor in closing arguments referred to the prior crime and then called defendant a "bad man."

The major concern with other-crimes evidence is always that the trier of fact may draw the inference that because a man has committed other crimes he is likely to have committed the current crime. *People v. Overlin,* 241 Ill. App. 3d 530, 538, 608 N.E.2d 925, 930 (1993). Here, the trial court instructed the jury to limit its consideration of the other-crimes evidence to the issues of *modus operandi* and state of mind. Although those reasons were improper based on the evidence, the instruction did reduce the likelihood the jury considered the other-crimes evidence as propensity to commit crimes (see *People v. Luczak,* 306 Ill. App. 3d 319, 328, 714 N.E.2d 995, 1001-02 (1999)). Faith in the jury to follow instructions and separate issues is the cornerstone of our jury system. *Luczak,* 306 Ill. App. 3d at 328, 714 N.E.2d at 1002.

Here, the evidence was not closely balanced. The victim identified defendant in a photographic lineup, an in-person lineup, and in court. Additionally, her detailed description of the pickup bolstered her identification.

Moreover, the evidence regarding the other crime was limited to that of the victim. The trial court did not allow a trial within a trial.

Accordingly, we find the error to be harmless beyond a reasonable doubt. The verdict would have been the same without the evidence, and thus reversal is not warranted.

## B. *Improper Statements by the Prosecutor*

■ Defendant next asserts his conviction should be reversed because the prosecutor made improper comments in his closing argument. The State argues defendant has waived this issue by failing to object in the trial court. Defendant argues we should consider the issue under the plain error rule (134 Ill. 2d R. 615(a)).

Defendant challenges the propriety of the prosecutor's following statements:

"We also need to protect the Vicki [T.]s out there. You remember her testimony yesterday. Ten years ago in 1990, this [d]efendant, while Vicki [T.] was walking home from work, came up to her, put a knife to her throat and put her in his car and drove her around, the exact same thing that happened ten years later in January of this year to Kristi [L.].

Folks, that's a bad man."

The prosecutor later stated:

"Ladies and gentlemen, when you retire back there, remember Kristi [L.] sitting there, that scared girl. Remember what happened to her on January 18. Remember, Vicki [T.] in 1990 was a poor scared girl, and now it's ten years later. She's grown up. Remember them sitting there testifying about what this [d]efendant did to them.

He is a bad man. You have an opportunity to convict him of these offenses, and you need to do that."

The prosecutor's reference to defendant as a bad man based on another crime was improper. However, in light of the persuasive identification testimony presented and the jury instruction, we find the few references did not affect the fairness of defendant's trial. Thus, we decline to review this issue as plain error.

## C. *Habitual Criminal Sentence*

■ Defendant last argues his sentence of life imprisonment without the possibility of parole under section 33B—1 of the Code is unconstitutional under *Apprendi*. Specifically, he contends the statute is unconstitutional because it does not require the findings that make a defendant a habitual criminal to be included in the indictment, submitted to a jury, and proved beyond a reasonable doubt. We review the constitutionality of a statute *de novo*. *People v. Fisher*, 184 Ill. 2d 441, 448, 705 N.E.2d 67, 71-72 (1998).

Section 33B—1 of the Code provides the following:

"(a) Every person who has been twice convicted in any state or federal court of an offense that contains the same elements as an offense now classified in Illinois as a Class X felony, criminal sexual assault, aggravated [kidnaping,] or first degree murder, and is

thereafter convicted of a Class X felony, criminal sexual assault[,] or first degree murder, committed after the 2 prior convictions, shall be adjudged an habitual criminal.

(b) The 2 prior convictions need not have been for the same offense.

(c) Any convictions which result from or are connected with the same transaction, or result from offenses committed at the same time, shall be counted for the purposes of this [s]ection as one conviction.

(d) This [a]rticle shall not apply unless each of the following requirements are satisfied:

(1) the third offense was committed after the effective date of this Act;

(2) the third offense was committed within 20 years of the date that judgment was entered on the first conviction, provided, however, that time spent in custody shall not be counted;

(3) the third offense was committed after conviction on the second offense;

(4) the second offense was committed after conviction on the first offense.

(e) Except when the death penalty is imposed, anyone adjudged an habitual criminal shall be sentenced to life imprisonment." 720 ILCS 5/33B—1 (West 2000).

In *Apprendi*, the Supreme Court held the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, XIV) require that, "[o]*ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Emphasis added.) *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. In support of the prior-crimes exception, the Supreme Court noted recidivism does not relate to the commission of the offense, and prior convictions have been entered pursuant to proceedings with substantial procedural safeguards of their own. *Apprendi*, 530 U.S. at 488, 147 L. Ed. 2d at 453-54, 120 S. Ct. at 2361-62.

Those same reasons for the recidivism exception recognized in *Apprendi* apply to section 33B—1 as well. The prior convictions providing the basis for defendant's life sentence under section 33B—1 were obtained through proceedings with substantial procedural safeguards. See *People v. Givens*, 319 Ill. App. 3d 910, 913-14, 747 N.E.2d 436, 439 (2001) (addressing the constitutionality of section 5—5—3(c)(8) of the Unified Code of Corrections (730 ILCS 5/5—5—3(c)(8) (West 1996)) under *Apprendi*). Additionally, the dates of the actions underlying those convictions can be ascertained from those proceedings. Moreover,

the factual findings required by section 33B—1 of the Code do not relate to the commission of the underlying offense. See *Givens*, 319 Ill. App. 3d at 914, 747 N.E.2d at 439. Accordingly, we find *Apprendi* does not render section 33B—1 of the Code unconstitutional.

We note the other districts have reached the same conclusion. See *People v. Pickens*, 323 Ill. App. 3d 429, 435, 752 N.E.2d 1195, 1200 (2001) (Fifth District); *People v. Boston*, 324 Ill. App. 3d 557, 563, 755 N.E.2d 1058, 1062 (2001) (Second District); *Morissette v. Briley*, 326 Ill. App. 3d 590, 593, 761 N.E.2d 333, 335 (2001) (Third District); *People v. Jones*, 328 Ill. App. 3d 233, 243, 764 N.E.2d 1232, 1239-40 (2002) (First District).

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, J., concurs.

PRESIDING JUSTICE MYERSCOUGH, specially concurring:

The other-crimes evidence was sufficiently similar to establish *modus operandi* and may have gone to state of mind as well. Both crimes occurred about the same time in the same area of Springfield, both victims were young females and were walking, both were followed by a vehicle from which the driver alighted, the man held a knife to the throats of both victims, both victims were forced into a vehicle, both victims were driven around and eventually released, and both victims identified defendant as the perpetrator.

The dissimilarities are distinctions without a difference. Defendant was obviously driving a different vehicle—the crime occurred 10 years later. The only distinction in the knife was a matter of inches, perhaps a mere inaccurate guess on the victims' parts. There was no evidence of a different type of knife. The victims were 14 and 19, both very young women of ages generally indistinguishable. Moreover, there was no pistol in the first incident—only a plastic toy gun. See 335 Ill. App. 3d at 776. (" 'a plastic silver pistol' ").

In addition, the majority is clearly incorrect in stating that neither the State nor the trial court could conceive of how the sexual assault in the first crime could be admissible and, therefore, the State did not seek to admit the evidence of the sexual assault. The record states that the trial court's ruling on defendant's pretrial motion *in limine* allowed for the admission of defendant's previous conviction, including the sexual assault, if defendant chose to testify that he was on

electronic monitoring at the time of the second crime as part of his defense. The trial court reasoned that if defendant testified to being on electronic monitoring, it would be less prejudicial to allow the State to introduce the evidence of the 1990 conviction than to allow the jury to speculate as to why defendant was on electronic monitoring. The trial court further stated that the evidence supported its belief that this second crime was a "trial run," perhaps further explaining why there was no sexual assault in the instant crime. However, defendant did not testify, so the prior sexual assault was not introduced.

I also believe the reference to defendant as a "bad man" based on both crimes was fair discourse. I would affirm outright.