2019 IL App (4th) 160641

NOS. 4-16-0641, 4-16-0750, 4-16-0751 cons.

FILED
July 24, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| ADAM C. SMITH, | ) | Nos. 15-CF-1335 |
| Defendant-Appellant. | ) | 16-CC-1 |
| | ) | 16-CC-2 |
| | ) | |
| | ) | Honorable |
| | ) | Karle E. Koritz, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justice Harris concurred in the judgment and opinion.
Justice Turner dissented, with opinion.

**OPINION**

¶ 1    Due to a voicemail left on Judge Robert C. Bollinger's answering machine, the State charged defendant, Adam C. Smith, with threatening a public official. During the pendency of that case (case No. 15-CF-1355), the trial court found defendant in direct criminal contempt (case No. 16-CC-1). On May 13, 2016, after the jury found defendant guilty of threatening a public official in case No. 15-CF-1355, the court sentenced defendant to 30 days in the county jail for direct criminal contempt in case No. 16-CC-1. At the sentencing hearing in July 2016, the court again found defendant in direct criminal contempt for actions he had taken since the last contempt ruling and sentenced him to 180 days in jail as a sanction in case No. 16-CC-2. The court sentenced defendant to 10 years in prison for threatening a public official. Defendant filed appeals in all three cases. These appeals were consolidated in March 2018 for purposes of our

review.

¶ 2        On appeal, defendant raises the following issues: (1) the State failed to prove beyond a reasonable doubt defendant intended to communicate a threat of unlawful violence to a public official; (2) section 12-9(a) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/12-9(a) (West 2014)) is unconstitutionally overbroad, violating the first amendment of the United States Constitution (U.S. Const., amend. I) and section 2 of article I of the Illinois Constitution (Ill. Const. 1970, art. I, § 2); (3) the trial court erred by allowing the State to introduce other-crimes evidence, which denied him a fair trial; (4) he was denied his statutory right to a speedy trial when the court granted the State's motion to continue the case past March 31, 2016; (5) the court erred by allowing him to proceed *pro se* at trial without first substantially complying with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984); (6) the court erred by not ordering, *sua sponte*, a hearing on his fitness, even though he had earlier been found fit to stand trial; (7) the court abused its discretion in summarily convicting him of direct criminal contempt in case Nos. 16-CC-1 and 16-CC-2; and (8) the court imposed an excessive sentence. We affirm in part and reverse in part.

¶ 3                                I. BACKGROUND

¶ 4        In November 2015, the State charged defendant by information with threatening a public official (720 ILCS 5/12-9(a)(1), (a)(2) (West 2014)). According to the charging instrument, on or about October 27, 2015, "defendant knowingly conveyed to a public official, Judge Robert Bollinger, by telephone a communication containing a threat that placed the public official in reasonable apprehension of future bodily harm." On November 4, 2015, the trial court (Judge Dan Flannell) gave defendant a copy of the information and read the charges to him. The court asked defendant whether he had counsel, wanted to obtain private counsel, or wanted the

court to appoint him a public defender. Defendant said he would represent himself because he believed the Macon County Public Defender's office was biased against him.

¶ 5        On November 25, 2015, at defendant's preliminary hearing, the trial court asked defendant if he still intended to represent himself or wanted a public defender appointed. Defendant again said he wanted to proceed *pro se* instead of being represented by the Macon County Public Defender's office. After finding the State established probable cause, the court again told defendant it would appoint a public defender to represent him but defendant did not have the right to choose who the public defender would be. Defendant said he would still proceed *pro se*.

¶ 6        On December 3, 2015, the case was assigned to Judge Karle Koritz, who normally sits in De Witt County.

¶ 7        On January 6, 2016, the State filed a motion for defendant to undergo a fitness evaluation. Defendant objected, arguing he had been found fit in a prior case and was fit. Over defendant's objection, the trial court appointed Dr. Rohi Patil to examine defendant and determine defendant's fitness to stand trial. On February 8, 2016, Dr. Patil submitted a report he prepared to the court, concluding defendant was fit to stand trial. The report stated:

> "[Defendant] is a young man with a long history of mental illness and noncompliance with treatment. He has been found unfit to stand trial in criminal matters on two occasions in the past. At this time, he demonstrates significant grandiosity as well as persecutory beliefs, but although we find his judgment to be impaired, we do not believe that he is psychotic. He clearly understands the charge against him, the possible consequences if

he is convicted, and courtroom processes and the roles of the major participants. We believe that he is fit to stand trial, although we fully expect him to try to impede the process through behavioral disruptions, bizarre motions, and other methods, and to feel fully justified in doing so."

¶ 8       On February 10, 2016, the trial court (Judge Koritz) found defendant fit to stand trial. Again, the court asked defendant whether he wanted to proceed *pro se*. The court stated it knew Judge Flannell had already admonished defendant regarding his right to counsel and found defendant made a knowing and intelligent waiver. However, the court stated it wanted to revisit the issue with defendant. The court explained the difficulties involved when a lay person defends himself in court. Defendant argued he was entitled to the appointment of private counsel rather than a public defender. The court told defendant it would appoint the Macon County Public Defender's office if defendant requested counsel. Defendant stated he would continue to represent himself.

¶ 9       The State also filed a motion to admit other-crimes evidence. The motion noted defendant had been in custody at the Macon County jail since October 28, 2015, which was the day after the alleged offense in case No. 15-CF-1355. According to the motion, on December 29, 2015, and January 7, 2016, while in jail, defendant tendered inmate-request slips to staff at the jail addressed to Judge Bollinger, both of which included statements to Judge Bollinger substantially similar to the voicemail left on Judge Bollinger's answering machine on October 27, 2015, which was the basis for the charge in case No. 15-CF-1355. The slip from December 29, 2015, referenced three Bible verses. The slip from January 7, 2016, also referenced multiple Bible verses. The State argued the request slips and the contents therein were relevant "other

crimes" evidence admissible to show defendant's intent and identity. The State also asked for the trial to be continued from March 31, 2016, until the May trial setting because one of the State's material witnesses, Detective Matt Whetstone, would be unavailable on March 31.

¶ 10       On March 11, 2016, the trial court held a pretrial hearing and heard arguments on various motions. During the hearing, the court noted defendant had referred to the assistant state's attorney as a "snake attorney" and included citations to certain Bible verses, including Psalm 141:6, which, according to the court, references judges being thrown from a cliff. The court ordered defendant to refrain from (1) any references to Bible verses, unless the verses somehow related substantively to the motion; (2) insulting or derogatory language; and/or (3) name-calling in any motion going forward. The court warned defendant he would be subject to criminal contempt proceedings if he violated this order.

¶ 11       The trial court then addressed the State's motion to admit other-crimes evidence. The State noted Sergeant Kris Thompson would testify he received an inmate-request slip addressed to Judge Bollinger that contained derogatory and threatening language. Thompson received the slip from Correctional Officer Joshua Wilson, who picked the slip up from defendant's cell on December 29, 2015. Sergeant Thompson himself picked up another inmate-request slip from defendant addressed to Judge Bollinger containing multiple Bible verses and derogatory and threatening language. Detective Whetstone would testify that he was the original investigating officer in the case and was familiar with the original voicemail left for Judge Bollinger and that the tone and content of the inmate-request slips were similar to the voicemail left for Judge Bollinger. The State asked the court to admit the inmate-request slips to show defendant's identity as the individual who left the voicemail and his intent to physically threaten Judge Bollinger when he left the voicemail message. Defendant argued this evidence should not

be admitted because the notes were written after the charged offense. The court granted the State's motion to admit the inmate-request slips as other-crimes evidence if the evidence was otherwise admissible and a proper foundation established. The court then denied the State's motion to continue defendant's trial off the March 31 calendar because the court thought the continuance could potentially affect defendant's right to a speedy trial.

¶ 12        The trial court also warned defendant about his behavior. The court noted allegations regarding defendant's erratic behavior might cause the court to question defendant's ability to represent himself and his fitness to stand trial. The court noted it did not have a *bona fide* doubt of defendant's fitness at that point but told defendant not to give the court a reason to have a *bona fide* doubt. The court also warned defendant his actions could cause him to be held in criminal contempt.

¶ 13        On May 10, 2016, the State filed a motion for a finding of direct criminal contempt. The court noted defendant had violated the court's order to not include derogatory and insulting language in documents he filed with the court. The State noted defendant referred to the case both as "fraudulent case No. 15-CF-1355" and "Adam C. Smith vs. Public Enemy # 1."

¶ 14        At a pretrial hearing on May 11, 2016, the trial court instructed defendant to keep his voice down, to stay calm, and not use terms like "BS" or "freaking." The court again told defendant he could be appointed a public defender to represent him. Defendant declined because the court was going to appoint a Macon County public defender. Defendant then told the court (Judge Koritz) defendant had made many complaints about him to the Judicial Inquiry Board. Defendant stated: "You, you keep that in mind with while Bollinger is being investigated, for hopefully the Judicial Inquiry Board is gonna hang—you're gonna be investigated right up above with them. So keep that in mind." The court immediately addressed defendant's comment,

stating the court had ordered defendant to not use language that demeans the dignity of the trial court. The court found defendant to be in direct criminal contempt of court for violating the court's order. Defendant responded he held the court "in contempt with the Judicial Inquiry Board."

¶ 15       The trial court then advised defendant of the basis for the court's contempt ruling. The court noted defendant raised his voice to the court and told the court it should keep in mind defendant had reported the judge to the Judicial Inquiry Board. The court also noted the various filings defendant had made since March 31 accusing the court of judicial corruption and extortion and defendant's continued references to Macon County as "Make-Up County" and his case as a "fraudulent court case." The court did not sentence defendant at that time.

¶ 16       Defendant's trial was held in May 2016. Defendant proceeded *pro se*. Although he was on trial for threatening a public official, his opening statement focused mainly on alleged wrongs committed by Judge Bollinger and law enforcement officers. Defendant told the jury he filed petitions in the circuit court regarding offenses police officers committed against him, including burglarizing his home while he was in jail on a prior charge. The Decatur Police Department refused to make an arrest. When law enforcement failed to act, he filed petitions at the circuit clerk's office. Defendant told the jurors Judge Bollinger filed a false police report against him and dismissed his *mandamus* petitions as part of a cover-up. He also told the jurors he had been denied his right to use the public law library in the Macon County courthouse and either Judge Bollinger, a detective, or someone in the state's attorney's office had illegally tampered with evidence. He ended his opening statement by telling the jurors the evidence in the case would prove Judge Bollinger's guilt and defendant's innocence.

¶ 17       Amanda Dillow testified she was Judge Bollinger's judicial clerk. Her job duties

included answering the phone, taking messages, scheduling court hearings, making sure cases were prepared for court, and making entries on the computer during court. If anyone from the public wanted to contact Judge Bollinger, they could call a phone number for a telephone line she answered. If she did not answer the call, a caller was given the option of leaving a voicemail message. On October 27, 2015, someone left a message that concerned her "because it was sort of a rambling-type of message, undertones of—I don't really want to say threatening, but it was kind of just unsettling." She told Judge Bollinger that someone, whom she believed was defendant, had left the judge an angry message. The judge did not listen to the message before court security was informed of it. Sergeant Lydell Kallenback and then Detective Whetstone came to the office and listened to the message. The judge listened to the message later in the day.

¶ 18        On cross-examination, defendant asked Dillow if she heard anything that was "actually threatening." She responded it was an implied threat. According to her testimony, "It was not a direct this-is-going-to-happen type of thing. It was more a watch-your-back type of thing." Defendant then asked her what words in the voicemail formed the basis for her belief the message contained an implied threat. She responded she could not say she remembered the message verbatim. However, the caller said something to the effect this would not be the last time Judge Bollinger heard from the caller. She described the message as an indirect threat. She did not know if the caller meant he was going to (1) report Judge Bollinger to the Judicial Inquiry Board or (2) physically harm the judge. However, she said the caller was very angry with Judge Bollinger.

¶ 19        On redirect examination, Dillow testified this was not a typical message normally left for Judge Bollinger. The message did not contain a specific, overt threat, but the message had a "blanket undertone." The caller was very angry, specifically with Judge Bollinger.

- 8 -

¶ 20        Judge Robert Bollinger testified he was a circuit court judge in Macon County. He handled a variety of cases, including miscellaneous remedy or "MR" cases. On October 26, 2015, he reviewed five petitions for leave to file *mandamus* actions filed by defendant. The five petitions asked for *mandamus* relief based on alleged misconduct by Macon County law enforcement and correctional officers, the Decatur Police Department, the state's attorney, and the "Residing" judge and other officials at the Macon County courthouse.

¶ 21        The certified records for these "MR" cases were admitted into evidence. In case No. 15-MR-997, defendant alleged someone working for the Macon County Sheriff's Office took the key to his home from the property room and then burglarized and vandalized his house. Defendant asked the trial court to issue an order compelling the unnamed individual working in the sheriff's department to be arrested and criminally charged. He also accused the Decatur Police Department of covering up the crime.

¶ 22        In case No. 15-MR-998, defendant asked to be allowed to use the Macon County law library. The named defendants in this case were the Macon County Sheriff's Office and the Macon County courthouse. According to his petition, the sheriff's department and courthouse personnel were violating his equal protection rights by denying him access to the law library.

¶ 23        In case No. 15-MR-999, defendant accused the state's attorney of filing fraudulent charges against him, which led to his wrongful imprisonment for 3½ years. He asked the state's attorney to provide him a "certificate of innocents [*sic*]" in case No. 11-CF-1712.

¶ 24        In case No. 15-MR-1000, defendant alleged Correctional Officer Samuel Hubner and/or Sergeant Flannery admitted fabricating and then destroying false forensic evidence. He wanted the named defendants fired from their jobs, arrested, and charged with criminal offenses.

¶ 25        Finally, in case No. 15-MR-1001, defendant alleged Officer Cory Maloney and

Correctional Officer Mounce violated section 103-8 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-8 (West 2014)) by eavesdropping on his communications with his attorney. He also alleged Officer Maloney tried to convince him to plead guilty in an earlier case. He asked for an order of *mandamus* compelling the two individuals to be fired, arrested, and criminally charged.

¶ 26　　　　On October 26, 2015, Judge Bollinger denied defendant's petitions for leave to file his *mandamus* petitions, found the five claims amounted to an abuse of the court process, dismissed the *mandamus* petitions, and denied defendant leave to amend his pleadings.

¶ 27　　　　The next day, Dillow informed Judge Bollinger of the voicemail message. She was somewhat alarmed by the message. Bollinger did not immediately listen to the message but asked someone from the Macon County Sheriff's Office to listen. Sergeant Kallenback came to his office and listened to the message. Bollinger listened to the message at that time. The message concerned him. He had never received a phone call similar to that message. He stated, "I was concerned because of certain language used in that—on that—message about what this caller's intentions were directed toward me." When asked whether anything about the call was specifically threatening, Bollinger stated he was particularly concerned the caller felt like he had tried to handle something legally but Judge Bollinger stopped him. The caller said Judge Bollinger would be hearing from someone if he did not reconsider what he had done. He testified the message placed him in fear of future bodily harm.

¶ 28　　　　Detective Matt Whetstone of the Macon County Sheriff's Office testified he reported to Judge Bollinger's chambers on October 27, 2015, because of a possible threat to the judge. He listened to the message left for the judge and recorded it on a portable voice recorder. The recorded message was played for the jury. The message stated:

"Yeah I was uh, wanting to speak with uh, Bollinger, but obviously that cock-sucker doesn't want to speak to the public, that corrupt son of a bitch, so uh. Well he's, uh, committed perjury and stuff and I've got all the facts on that, so uh, well that's, that's, that's on him, that, that's on him if that's the corruption that he wants to illegally play. So uh, uh, I'm sure he'll be hearing more from someone so alright… I was just trying to give him, you know, another chance to, uh, you know, reconsider, while he's, he's got a chance to so, I was uh, yeah, you know, trying to do something correct, trying to go about things legally to get some things taken care of, for which he was obviously trying to cover up, so I'll take it from there … so alrighty, thank you … bye-bye."

Detective Whetstone testified the voice in the recording belonged to defendant.

¶ 29     On October 28, 2015, Whetstone spoke with defendant. The telephone number defendant provided Whetstone was the number the caller to Judge Bollinger used to leave the message at issue.

¶ 30     The trial court allowed the State to present evidence regarding the inmate-request slips defendant left for Judge Bollinger at the jail. The court instructed the jury this evidence would "be received on the issues of the Defendant's identification and intent and may be considered by you only for that limited purpose." The court told the jury, "It is for you to determine whether the Defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issues of the Defendant's identification and intent only."

¶ 31     Correctional Officer Joshua Wilson with the Macon County Sheriff's Office

testified he picked up an inmate-request slip from defendant's cell on December 29, 2015. No one but defendant was in the cell at that time. Wilson could not do anything with the request so he passed it on to Sergeant Kris Thompson. Wilson said the request slip was not requesting anything and did not include any threats as far as he could tell.

¶ 32        Sergeant Kris Thompson of the Macon County Sheriff's Office testified he was assigned to the county jail. His duties at the jail included reviewing hundreds of inmate request slips and facilitating things the inmates needed. He also supervised corrections officers working in the jail. Officer Wilson provided him with an inmate-request slip on December 29, 2015. The request form had been filled out by defendant. The inmate addressed the request slip to Judge Bollinger. The request slip cited Psalms 55:15 and 141:6 and Isaiah 40:23. Defendant also wrote on the form, "I'm going to prove you guilty of your fraudulent charge and corruption against me, and do my best to get you prosecuted. This is a fact, not a threat, you anti-American communistic piece of shit." Defendant then drew a middle finger and wrote "F U!"

¶ 33        Defendant had access to a Bible when he wrote this slip. The State introduced a Bible taken from defendant's cell. In the Bible taken from defendant's cell, Psalm 55:15 states: "Let death seize them. Let them go down alive into hell for wickedness. It is in their dwellings and among them." Psalm 141:6 states: "Their judges are overthrown by the sides of the cliff, and they hear my words, for they are sweet." Isaiah 40:23 reads: "He brings the princes to nothing. He makes the judges of the earth useless."

¶ 34        Sergeant Thompson testified he received another inmate-request slip from defendant on January 7, 2016, which again was addressed to Judge Bollinger. This slip cited Deuteronomy 32:30, 31, 34, and 42; Psalm 55:15, 28:23, and 144:6; Isaiah 33:22 and 40:23; and Amos 2:3. The slip then states:

- 12 -

"Praise the Lord.

As my right to freedom of speech and my job to preach the word of the Lord as his servant, I'm sharing the word of the Lord with Judge Bollinger, due to his fraudulent charge against me, and because he defies the Lord of hosts, and due to his corruption he is being investigated for the purpose of prosecution and conviction. I'm doing my best to help in the investigation. Praise the Lord."

Defendant then cited Psalm 144:9 and signed his name to the slip. Defendant then wrote:

"All this writing is a fact, not a threat. You cocksucking piece of shit, so don't take it any other way unless it's up your ass, you fag. Hey Bollinger, if you like balls, I'd like to ball you up as a bowling ball and strike out the rest of make-up counties' judges and state's attorneys, then I'll make your ass a gutter ball. Talking about your mind being in the gutter, have you been to Play-Mor Lanes yet? I'm going[.] I'm going to striking [*sic*] out the entire corruption ring, I'm playing major league baseball man."

Thompson testified Deuteronomy 32:30 states, "How could one chase a thousand, and two put ten thousand to flight, unless their rock had sold them, and the Lord surrendered them. For the rock is not like our rock, even our enemies themselves being judges." Deuteronomy 32:41-42 states:

"If I whet my glittering sword and my hand takes hold on judgment; I will render vengeance to my enemies and repay those who hate me. I will make my arrows drunk with blood, and my

sword shall devour flesh; with the blood of the slain and the captives from the heads of the leaders of the enemy."

Psalm 68:23 states: "That your foot may crush them in blood, and the tongues of your dogs may have their portion from your enemies." Isaiah 33:22 states: "For the Lord is our judge, the Lord is our lawgiver. The Lord is our king, he will save us." Amos 2:3 states: "And I will cut off the judges from its midst, and slay all its princes with him, says the Lord."

¶ 35        During its closing argument, the State told the jury:

"The real issue in this case that you have to resolve is, was the message that was left a threat? And as I indicated when we— when I gave opening statements, that was not going to be a situation where there was anything overt. There was not any kind of specific allegations of a future action in and of itself. He wasn't saying, 'I'm going to do something. I'm going to do X.' And so we have to determine, was the nature of what was left a threat, such that it would place the judge in reasonable apprehension of future bodily harm.

So how do we determine whether or not the message that was left was a threat? Well, first of all you have to put it into context. You can't take the phone call and look at the words in the phone call in a vacuum. You have to consider one, who made the call, the defendant, after his petitions were dismissed. And you have to look at the context. Again, the context being obviously the judge has done something that he doesn't like, and now he he's

calling to let the judge know he didn't like it.

*** 

So when you're looking at whether or not, what the meaning of the defendant's words were when he left those, what his intentions were when he left that message, you have to look at not just the words, but what was—what was the feel of them?"

¶ 36 In defendant's closing argument, he contended using profane language may be socially unacceptable, but it is protected by the first amendment. According to defendant, the caller who left the message was only telling Judge Bollinger he was being given a chance to reconsider his earlier decision before he turned the judge in for "perjury and alleged corruption." Defendant again talked about his complaint against the Macon County Sheriff's Office and a petition against Sergeant Kallenback to stop stalking and harassing him and "spying" on legal documents he was filing. He also argued documents had been "illegally altered" and asked why anyone would need to alter documents if he was guilty. Defendant then told the jury:

"It's my right to petition the government for a redress of grievances. It is my right under the First Amendment. It is my right to petition the government for a redress of grievances. Judge Bollinger denied that right by dismissing my petitions without the ability to amend. My petitions were to have officers arrested for burglarizing my house, including other crimes they committed against me, and for me to be allowed into the public law library, which Sergeant Kallenback over there denied me.

So yes, I am angry, and I'm sorry for my anger. But a

- 15 -

Lieutenant Brown, chief of investigations, was the one who took my complaints of burglary and other crimes committed by officers. They all had me arrested to stop me from pursuing charges to cover it all up. Bollinger dismissed my petitions without the ability to amend in order to cover up the crimes of the officers that—of the crimes they committed against me. So of course Bollinger is afraid of prosecution and a lawsuit if I was to turn him in. He wants you to say that I'm guilty, so that he will not be found guilty.

The caller did Bollinger a favor by giving him a second chance. The caller didn't have to take time to give him a second chance before turning him in, he could have just turned him in without saying anything. In return for the caller's favor I was falsely arrested, retaliation for a favor. The state's attorney is a twister, just like a tornado. They like to twist words at the expense of your tax dollars, hard-earned tax dollars at that, while keeping innocent people like me locked up.

The Bible calls the state's attorney an accuser of a threat. Ladies and gentlemen, I am not a criminal. I am a victim of this court and law enforcement. I come in the name of the Lord as a child of God. Please find me guilty [*sic*] so I can go home with life, liberty, and the pursuit of happiness in the name of justice, so I can again, once again continue to pursue justice. All scripture is God breathing and profitable for doctrine for correcting and rethinking,

according to the holy scriptures. I don't deserve to go to prison for that voice mail recording, for their cover-ups. There was no threat of any kind of bodily harm on that voice mail. Please tell the court I am not guilty in the name of justice. Thank you for your time, and may God bless you."

¶ 37 The jury found defendant guilty of threatening a public official. The trial court then sentenced defendant to 30 days in the county jail in case No. 16-CC-1.

¶ 38 On July 11, 2016, the trial court held a hearing on defendant's second amended motion for new trial and sentencing hearing. At the hearing, the court noted defendant had engaged in additional conduct similar to the conduct for which he had already been held in contempt. As a result, the court again found him to be in direct criminal contempt for the conduct he had engaged in since the last contempt finding, specifically for using abusive and derogatory language that diminished the dignity of the court through some of his court filings.

¶ 39 When the trial court asked if defendant wanted to make a statement, defendant responded, "Yeah. I hope to collapse this whole corruption ring and this whole corrupt court on every corrupted judge, including you." The court then sentenced defendant to six months in the county jail as a sanction for his direct criminal contempt. Defendant then made additional comments accusing the trial judge of covering up corruption and the state's attorney of bribing the Attorney Registration and Disciplinary Commission. The court advised defendant of his appeal rights with regard to both contempt case Nos. 16-CC-1 and 16-CC-2. The court denied defendant's second amended motion for a new trial.

¶ 40 During the sentencing portion of the hearing, the State recommended defendant receive the maximum 10-year, extended-term sentence. The State noted defendant had been

charged with additional threats to Judge Bollinger and had no remorse for his actions in this case, refusing to acknowledge any wrongdoing. In addition, the State noted defendant's statement the corruption ring in Macon County needed to be destroyed by an organized militia. Finally, the State asked the court to consider the need to protect the public from defendant.

¶ 41 Defendant responded the public was not in any danger from him but were in danger from the trial court and the state's attorney framing them on fraudulent criminal charges. He then stated:

"As far as give me liberty or give me a gun, that's a right under the Second Amendment which states when there's— paraphrased—when a free state—and Illinois is supposed to be a free state, if I remember correctly—when there is an enemy, foreign or domestic—domestic enemy like such as this, this government here—there's supposed to be a well-organized militia formed for the security to eliminate them under the Second Amendment.

There is supposed to be a militia to protect the security of the public such as myself and everybody else that would fall victim and be victimized by a corrupt judicial system that threatens the security of a free state such as this Court, such as a State's Attorney, such as these corrupt judges.

Those who obstruct justice are a threat to the security of U.S. citizens. I'm a U.S. citizen. I'm innocent. I'm a victim of you. I'm a victim of her. I'm a victim of every corrupt public official

- 18 -

and, according to the Second Amendment, they need to be eliminated. According to that. Those ain't my words. That's the Second Amendment for the security of a free state. The right to keep and bear arms shall not be infringed are the last words. There is supposed to be a militia formed to protect the people when they are in danger from a threat such as yourselves."

The court then questioned defendant about his statements regarding foreign or domestic enemies that needed to be eliminated, specifically asking defendant who the second amendment gave him a right to eliminate for being a domestic enemy. Defendant answered the enemy was the sheriff's department because it was burglarizing people's homes and the state's attorney who was involved in the burglaries.

¶ 42        The trial court then began explaining its sentencing decision. The court found it difficult to identify any mitigating factor provided by defendant's testimony except for defendant's intellectual disability. The court did not know whether defendant had a mental illness or, if he did, the extent of any illness, but the court was concerned about that possibility. Defendant interrupted the court, stating he was not intellectually disabled or mentally ill. The court warned defendant he could be removed from the courtroom if he disrupted the hearing.

¶ 43        The trial court noted defendant had prior felonies including possession of a firearm without a Firearm Owner's Identification card, possession of a weapon or a firearm by a felon, and knowingly causing damage to property over $300. Defendant had been sentenced to five years in prison. Defendant also had a history of misdemeanor convictions that were violent in nature. The court stated defendant had a history of being unable to conform himself within the confines of lawful behavior and a prison sentence was necessary to protect the public. Further,

the court stated a sentence of probation would deprecate the seriousness of defendant's actions. The court was very concerned about defendant's statements about guns and militias, which the court found went beyond simply advocating for his right to bear arms. The court and defendant then had the following exchange:

"[THE COURT]: But you're not simply advocating for your right to bear arms. You're advocating for a well-regulated militia to become armed and to solve the problems, your problems as you see them, with firearms. And you've identified a number of people that you believe are the source of your problems, and the Court can only construe your statements here today as an intent to either yourself or encourage others to take up firearms.

[DEFENDANT]: To protect themselves against people like you from people like you.

[THE COURT]: Against the Macon County Sheriff's Department, against Judge Bollinger, against the State's Attorney['s] office. That is very, very alarming."

When the court said defendant was a threat to the public, defendant interrupted, saying the trial judge was the threat to the public. The court then ordered defendant be taken from the courtroom. Defendant then told the court:

"And with that, I'll say fuck you, you cocksuckin' son-of-a-bitch. You corrupt motherfucker.

May the commission and God destroy every one of you corrupt motherfuckers, cocksuckin' son-of-a-bitches. The public is

- 20 -

in danger of cocksuckers like you, you motherfucker. I hope they

frame your ass."

In imposing defendant's sentence, the court stated that prior to the sentencing hearing it was considering a sentence between four and seven years in prison. However, after hearing defendant's alarming statements and the clear threat to the public posed by those statements, the court noted it needed to impose the maximum extended-term sentence, which was 10 years.

¶ 44        On August 5, 2016, defendant filed his notices of appeal by placing them in the institutional mail of the prison where he was incarcerated. This court appointed the Office of the State Appellate Defender to represent defendant in his appeals. On December 6, 2016, this court allowed defendant's motion for leave to file a late notice of appeal in case No. 16-CC-1.

¶ 45                                II. ANALYSIS

¶ 46                        A. Threatening a Public Official

¶ 47        A person commits the crime of threatening a public official when:

"(1) that person knowingly delivers or conveys, directly or

indirectly, to a public official or human service provider by any

means a communication:

(i) containing a threat that would place the public

official or human service provider or a member of his or

her immediate family in reasonable apprehension of

immediate or future bodily harm, sexual assault,

confinement, or restraint; or

(ii) containing a threat that would place the public

official or human service provider or a member of his or

- 21 -

her immediate family in reasonable apprehension that damage will occur to property in the custody, care, or control of the public official or his or her immediate family; and

(2) the threat was conveyed because of the performance or nonperformance of some public duty or duty as a human service provider, because of hostility of the person making the threat toward the status or position of the public official or the human service provider, or because of any other factor related to the official's public existence." 720 ILCS 5/12-9(a) (West 2014).

¶ 48        Section 12-9(a) requires a defendant to place the victim or immediate family in reasonable apprehension of damage to property or immediate or future bodily harm. While content-based laws targeting speech based on its communicative content are presumed to be invalid as violative of the first amendment of the United States Constitution (*People v. Relerford*, 2017 IL 121094, ¶ 32, 104 N.E.3d 341), the United States Supreme Court has recognized certain categories of speech which do not fall within the protections of the first amendment, including "true threats" of violence. *Watts v. United States*, 394 U.S. 705, 708 (1969) (*per curiam*). If the State charges an individual with threatening a public official under section 12-9 of the Criminal Code (720 ILCS 5/12-9(a) (West 2014)), the threat of violence must be a "true threat," or else the prosecution will violate the first amendment. *People v. Dye*, 2015 IL App (4th) 130799, ¶ 8, 37 N.E.3d 465.

¶ 49    In *Dye*, 2015 IL App (4th) 130799, ¶ 9, this court quoted the language of *Virginia v. Black*, 538 U.S. 343, 359-60 (2003), where the United States Supreme Court described a "true threat" as follows:

> " ' "True threats" ' encompass those statements where the speaker *means* to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.] The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. [Citation.] Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the *intent* of placing the victim in fear of bodily harm or death.' " (Emphases in original.)

¶ 50    *Black* made it clear "true threats" involved those situations where a speaker has the intent to threaten with violence. When assessing the nature of a threat within the context of section 12-9, the question is not whether the speaker intends to act on the threat of violence. See *Black*, 538 U.S. at 360 (stating the speaker need not actually intend to carry out the threatened violence). Instead, the speaker must recognize the threatening nature of his comments. In *Elonis v. United States*, 575 U.S. ___, 135 S. Ct. 2001 (2015), the Supreme Court discussed the necessary mental state of a defendant charged with uttering a "true threat" under a federal statute prohibiting the communication of a threat in interstate commerce. Since the statute was silent

with regard to the required mental state, the Supreme Court found the " 'calculated purveyance' of a threat would require that [the defendant] know the threatening nature of his communication." *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012. It held the statute's mental state requirement was met if he transmitted a communication "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012.

¶ 51 Other Illinois courts addressing section 12-9 have likewise concluded "intentionality on the defendant's part is required." (Internal quotation marks omitted.) *People v. Goodwin*, 2018 IL App (1st) 152045, ¶ 38; see also *People v. Wood*, 2017 IL App (1st) 143135, ¶ 13; *Dye*, 2015 IL App (4th) 130799, ¶ 10. In *Dye*, we noted section 12-9 must be interpreted " 'within the confines of the first amendment' " *Dye*, 2015 IL App (4th) 130799, ¶ 10 (quoting *People v. Diomedes*, 2014 IL App (2d) 121080, ¶ 30, 13 N.E.3d 125). Although the statute *requires* only knowledge (knowingly), "the first amendment allows a state to punish an alleged threat of violence only if it is a 'true threat' [citations]; and because a 'true threat' is intentional, not merely knowing [citation], we interpret section 12-9 as requiring intentionality." *Dye*, 2015 IL App (4th) 130799, ¶ 10. "Intentionality in this context means that, for a conviction for threatening a public official to stand, the threat must be a 'true threat.' " (Internal quotation marks omitted.) *Wood*, 2017 IL App (1st) 143135, ¶ 13. Referencing the definition from *Black* above, the court in *Wood* observed the Supreme Court required statutes seeking to criminalize speech demand "proof that the speaker intends the communication to be a threat and that a reasonable listener would understand the communication to be threatening." *Wood*, 2017 IL App (1st) 143135, ¶ 13 (citing *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2011).

¶ 52 The Second District addressed the same issue in *People v. Bona*, 2018 IL App

(2d) 160581, 118 N.E.3d 1272, which dealt with two voicemails to a state representative. Evaluating the constitutionality of section 12-9, the *Bona* court disagreed with the *Wood* court's interpretation of *Elonis*, contending the language " 'for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat' " was to be read in the disjunctive and the definition of "true threat" was satisfied if a defendant's communication was either (1) with intent to issue a threat or (2) with knowledge that it will be viewed as a threat. *Bona*, 2018 IL App (2d) 160581, ¶¶ 30, 35 (quoting *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2012). *Elonis*, of course, was seeking to define a "true threat" in the context of a federal statute prohibiting threats conveyed through interstate commerce. See *Bona*, 2018 IL App (2d) 160581, ¶ 27. Here, we have a statute that requires both (1) the communication of a violent threat and (2) that the threat places the recipient in reasonable apprehension of bodily harm, so the "intentionality" of the defendant that the communication be construed as a "true threat" remains. In *Goodwin*, 2018 IL App (1st) 152045, ¶ 42, the First District concluded "the language of the statute makes clear that defendant's subjective intent is relevant to determine whether the State satisfied the requisite elements."

¶ 53      It is clear from the Supreme Court's decision in *Watts*, 394 U.S. 705, the context in which an alleged threat is made is important in determining whether the alleged threat constitutes a "true threat." In *Watts*, the defendant, an 18-year-old man, was convicted of threatening President Lyndon B. Johnson. *Watts*, 394 U.S. at 706. The alleged threat occurred during a public rally on the grounds of the Washington Monument. *Watts*, 394 U.S. at 706. After the crowd broke up into small groups, the defendant joined a group to discuss police brutality. *Watts*, 394 U.S. at 706. Most of the individuals in the group were young, in their late teens and early twenties. *Watts*, 394 U.S. at 706. In response to a comment that young people should

become more educated before expressing their views, the defendant stated: " 'They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.' " *Watts*, 394 U.S. at 706. Watts was convicted based on this comment. *Watts*, 394 U.S. at 705-06. According to the Court:

"[Watts's attorney] stressed the fact that petitioner's statement was made during a political debate, that it was expressly made conditional upon an event—induction into the Armed Forces— which petitioner vowed would never occur, and that both petitioner and the crowd laughed after the statement was made. He concluded, 'Now actually what happened here is all this was a kind of very crude offensive method of stating a political opposition to the President. What he was saying, he says, I don't want to shoot black people because I don't consider them my enemy, and if they put a rifle in my hand it is the people that put the rifle in my hand, as symbolized by the President, who are my real enemy.' " *Watts*, 394 U.S. at 707.

¶ 54         The Supreme Court reversed the defendant's conviction, agreeing the defendant's statement was simply a crude method of stating his political opposition to President Johnson. *Watts*, 394 U.S. at 708. According to the Court, "[t]aken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise." *Watts*, 394 U.S. at 708. In evaluating the evidence to determine if

defendant made a true threat, we must first look to see if the trial court erred in admitting the inmate-request slips as other-crimes evidence.

¶ 55                    1. *Admissibility of Other-Crimes Evidence*

¶ 56        Defendant contends the trial court abused its discretion in allowing the State to present the two inmate-request slips as substantive other-crimes evidence. Before addressing defendant's sufficiency of the evidence claim, it would be appropriate to determine whether the other-crimes evidence was properly admitted since the outcome could affect the nature and extent of properly admitted evidence against him. Defendant concedes he did not properly preserve this issue but asks this court to review it pursuant to the plain-error doctrine. The first step in any plain-error analysis is determining whether an error occurred. *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 31, 972 N.E.2d 1272.

¶ 57        We will only find error with regard to a trial court's decision to admit other-crimes evidence if the court abused its discretion. *People v. Thingvold*, 145 Ill. 2d 441, 452-53, 584 N.E.2d 89, 93-94 (1991). The issue is not whether another court would have made the same decision. Instead, the question is whether the trial court's decision was so fanciful, arbitrary, or unreasonable that no reasonable court would agree with it. *People v. Peterson*, 2017 IL 120331, ¶ 125, 106 N.E.3d 944.

¶ 58        Our supreme court has stated evidence of other bad acts is admissible if it is relevant for some purpose other than demonstrating a defendant's propensity to commit crime. See *People v. Adkins*, 239 Ill. 2d 1, 22-23, 940 N.E.2d 11, 24 (2010). Evidence of other crimes "may be relevant to prove *modus operandi*, intent, identity, motive or absence of mistake." *People v. Robinson*, 167 Ill. 2d 53, 62-63, 656 N.E.2d 1090, 1094 (1995). "When such evidence is offered, it is incumbent upon the trial judge to weigh the relevance of the evidence to establish

the purpose for which it is offered against the prejudicial effect the introduction of such evidence may have upon the defendant." *People v. Stewart*, 105 Ill. 2d 22, 62, 473 N.E.2d 840, 860 (1984), *abrogated on other grounds by People v. Gacho*, 122 Ill. 2d 221, 522 N.E.2d 1146 (1988). "Even when such evidence is offered for a permissible purpose and not solely for propensity, such evidence will not be admitted if its prejudicial impact substantially outweighs its probative value." *People v. Chapman*, 2012 IL 111896, ¶ 19, 965 N.E.2d 1119. The erroneous admission of other-crimes evidence carries a high risk of prejudice and will ordinarily require reversal if the erroneously admitted evidence was "so prejudicial as to deny the defendant a fair trial; that is, the erroneously admitted evidence must have been a material factor in the defendant's conviction such that without the evidence the verdict likely would have been different." *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 45, 25 N.E.3d 1189.

¶ 59        "Evidence of another crime, however, may be used only when the other crime has some threshold similarity to the crime charged. It is this similarity which increases the relevance of the evidence and ensures that it is not being used solely to establish the defendant's criminal propensities." *People v. Bartall*, 98 Ill. 2d 294, 310, 456 N.E.2d 59, 67 (1983). "[W]here a defendant's involvement in another offense was offered to prove the absence of an innocent frame of mind or the presence of criminal intent, mere general areas of similarity have sufficed." *People v. Cruz*, 162 Ill. 2d 314, 349-50, 643 N.E.2d 636, 653 (1994).

¶ 60        The State's claimed bases for admitting the inmate-request slips were to identify defendant as the speaker on the voicemail and to establish defendant's threatening intent. Although identity was technically an issue since defendant, as a self-represented litigant, refused to acknowledge having made the phone call, Judge Bollinger's clerk, Dillow, who first heard the voicemail message, believed the caller to be defendant and informed Judge Bollinger of that fact

when she told him about the phone message. When questioned by Detective Whetstone, defendant provided his telephone number, which matched the caller's number reflected in the message, and Detective Whetstone, after speaking with defendant, identified him as the caller based on the voice he heard on the recording. In reality, there was little question of identity, so any need to use the inmate-request slips for that purpose was minimal. With little need to prove identity, the prejudicial impact of the inmate-request slips far outweighed their probative value, as we will discuss later.

¶ 61    The State contends the use of the inmate-request slips was also necessary to establish identity through *modus operandi*. "In cases where evidence of other crimes is offered, however, to establish *modus operandi* or a common design or plan, a 'high degree of identity' between the facts of the crime charged and the other offense has been required." *Cruz*, 162 Ill. 2d at 349. The supreme court in *Cruz* went on to explain, even though some degree of dissimilarity will always exist, "[t]his high degree of identity between the other offense and the charged crime is necessary because *modus operandi* refers to a pattern of criminal behavior *so distinctive* that separate crimes are recognized as the handiwork of the same wrongdoer." (Emphasis added.) *Cruz*, 162 Ill. 2d at 349. In *People v. Clark*, 2015 IL App (1st) 131678, 35 N.E.3d 1060, the First District explained it thusly:

> "Under this theory, the State relies 'on an inference that a distinctive pattern of criminal activity earmarks the crimes as the work of a particular individual or group.' [Citation.] In other words, because the crimes are committed in the same unique way or with the same characteristic signature, it is more likely that the same person committed each of them." *Clark*, 2015 IL App (1st)

131678, ¶ 52 (quoting *Robinson*, 167 Ill. 2d at 65).

¶ 62    "The degree of similarity required to introduce other-crime evidence under the *modus-operandi* or common-design exceptions is higher than for any of the other exceptions." *Clark*, 2015 IL App (1st) 131678, ¶ 53. Absent sufficient evidence of similarities, collateral offenses should not be admitted to show *modus operandi*. *People v. Allen*, 335 Ill. App. 3d 773, 780, 780 N.E.2d 1133, 1139 (2002). In *Allen*, 335 Ill. App. 3d at 780, although this court found the error to be harmless, we noted that in order to prove identity, "a strong and persuasive showing of similarity between the charged crime and the other-crimes evidence must be present." Where the prior bad act is the same or substantially similar to the offense for which a defendant is on trial, the potential for overwhelming prejudice is even greater. See *Clark*, 2015 IL App (1st) 131678, ¶ 27.

¶ 63    The State conflates those factors that go to establish identity with those circumstantially indicative of *modus operandi* to argue a high degree of factual similarity. It contends such things as defendant's phone number matching the caller's; the fact the comments are of similar "tone," are directed to Judge Bollinger, and allege "corruption"; and that the inmate-request slips came from defendant's cell are all somehow circumstantial evidence of identity through *modus operandi*. The fact defendant's phone number matches the number that left the voice message does nothing to show *modus operandi*; it is circumstantial evidence of identity, just like the fact his voice was recognized and the slips came from his cell. These factors do nothing to establish a distinct pattern of criminal behavior. The fact the phone call and inmate-request slips are tied to defendant is hardly a similarity. It would be a threshold requirement for use of other crimes and would not constitute a separate factor to consider. Here, the similarities between the voicemail and the slips are simply that the caller and defendant

directed his comments to Judge Bollinger, alleged he is corrupt, and used foul language toward him. Aside from the claim of corruption, the use of profanity in the voicemail message and inmate slips does nothing to create a distinct pattern of criminal behavior. As crude and profane as both the slips and voicemail may be, the two share no other similarities but instead many differences. The inmate-request slips contain multiple citations to biblical scripture. One references sharing the word of the Lord with Judge Bollinger and contains the phrase "Praise the Lord" twice. Other than the citation of scripture, the first slip has none of the other religious references. The voicemail contains no religious references whatsoever, nor does it reference any biblical scriptures. The first slip talks about how defendant wants to assist in prosecuting Judge Bollinger to "prove you guilty of your fraudulent charge and corruption against me," while the voice message merely talks about the alleged corruption of Judge Bollinger in general. The second slip is similar to the first in that it too mentions "fraudulent charges against me," the hoped-for prosecution of Judge Bollinger, defendant's willingness to assist, and alleged corruption in general. However, it is not the similarities between the two slips that contribute to their admission. There must be a high degree of identity between the charged offense and the other conduct to be established. *Cruz*, 162 Ill. 2d at 349. Instead, perhaps the greatest and most obvious difference between the inmate-request slips and the voice message is the simple fact the voice message was left without the caller identifying himself, while the inmate-request slips are signed by defendant and addressed to "Judge Bollinger."

¶ 64    The State's real purpose in seeking admission of the slips is to attempt to establish defendant's state of mind at the time of the phone message. The State argues the language of the inmate-request slips and citations to biblical scripture are probative of defendant's intent to threaten Judge Bollinger in the original voicemail. There are a number of problems with that

argument, not the least of which are the dramatically different circumstances under which they were generated. Although argued as *post hoc* evidence of intent, the primary difference between the call and the slips is that, at the time of the call, defendant had merely been ruled against as a self-represented litigant in a series of *mandamus* actions and was a free man. By the time the slips were written, defendant had been charged with a crime for leaving the call and had been in custody for several months. The circumstances surrounding the two different events make them dissimilar. When considered carefully, the telephone message, although crude, offensive, and insulting, arguably could constitute nothing more than a *pro se* oral motion for reconsideration of the court's ruling. Even the judge's clerk testified that, although the caller sounded "very angry" and the message contained "lots of *** vulgar language," it was, in her words, "sort of a rambling-type of message." She declined to go so far as to say the message was "threatening" but considered it "kind of unsettling." Conversely, by the time defendant prepared the inmate slips, it is just as reasonable to conclude defendant was venting about how a "harmless" (in his mind) phone call got him arrested, charged with a crime, and incarcerated for months. In fact, the two inmate-request slips each specifically reference the charges pending against him and are indicative of his state of mind at that time, not reflective of his state of mind two months before. At the time he wrote the inmate slips, defendant may well have harbored thoughts of harm to Judge Bollinger and intended for the slips to express that intention (although they do not appear to go beyond a crude and profane rant about Judge Bollinger and judges in general). More importantly, they were not the matters for which defendant was on trial. To permit the State to relate them back to a point in time where the only thing defendant had suffered was the dismissal of his *mandamus* actions was inappropriate.

¶ 65 The State further sought to establish defendant's preexisting intent from the

various religious scriptures cited in the two notes. Two important points to keep in mind: (1) the actual scriptures were not written out—it was up to the reader to look up each individually to see what they said—and (2) although the State tendered the Bible available to defendant in jail as a basis for the scriptural content, depending on which of the various versions were used by the reader, the content of the scriptures would be different. Which version would the reader use—King James, New International, New American Standard, New King James, English Standard, New Living Tradition? The list goes on.

¶ 66 The inmate-request slip from December 29, 2015, two months after the October 27 telephone message, merely lists three biblical chapters and verses. After the scriptural citations, defendant wrote: "I'm going to prove you guilty of your fraudulent charge and corruption against me, and do my best to get you prosecuted. This is a fact, not a threat, you anti-American communistic piece of shit." Defendant then drew a middle finger and wrote "F U!" Is it clear defendant is upset with Judge Bollinger? Absolutely. He wants the judge prosecuted for some unspecified corruption related to the charge now pending against him and intends to assist in doing so. The rest is a profane name-calling rant. Nothing in that inmate request form can be interpreted as a "true threat" or " 'a serious expression of an intent to commit an act of unlawful violence' " with " 'the *intent* of placing the victim in fear of bodily harm or death.' " (Emphasis in original.) *Dye*, 2015 IL App (4th) 130799, ¶ 9 (quoting *Black*, 538 U.S. at 359-60). From the language of the note, defendant is speaking about the criminal charge pending against him as opposed to the earlier dismissal of the *mandamus* petitions. Defendant's intention regarding the use of biblical scripture is explained in the second inmate-request slip, where defendant lists another series of biblical scriptures. After a fairly common Christian religious exhortation, "Praise the Lord," in the second inmate-request slip, defendant comments not only on his

constitutional right to freedom of speech but his perceived duty under basic evangelical Christian theology, which recognizes the responsibility all of its followers have to "preach the word of the Lord" pursuant to the "Great Commission" found in the Book of Mark, Chapter 16, verses 14-20. The note again references what defendant considers the "fraudulent" charge against him. Defendant contends he is doing whatever he can to assist in the investigation. After another scriptural citation, defendant again engages in a crude and profane rant against Judge Bollinger along with a discussion of things he would "like" to do with Judge Bollinger, which are all physically impossible and clearly intended metaphorically.

¶ 67        Both these notes reference the charge for which he is currently in custody, which makes the motivation of the inmate-request slips appear to be primarily his charged offense and subsequent incarceration. As such, the jail slips carry little probative weight of his state of mind at the time of the telephone call other than his obvious dislike of and lack of respect for Judge Bollinger. Neither of those things amount to a "true threat."

¶ 68        As noted, when admitting other-crimes evidence, a trial court must weigh whether the undue prejudice outweighs the probative value. See *People v. Donoho*, 204 Ill. 2d 159, 170, 788 N.E.2d 707, 714-15 (2003). In weighing the probative value against the undue prejudice, the court may consider the proximity in time to the charged offense, the degree of factual similarity to the charged offense, or other relevant facts and circumstances. 725 ILCS 5/115-7.3(c)(1)-(3) (West 2014). This is a balancing test with probative value on one side and prejudicial impact on the other side. Recognizing that evidence of other crimes is generally inadmissible expressly because of its prejudicial impact on jurors (see *People v. Dabbs*, 239 Ill. 2d 277, 289-90, 940 N.E.2d 1088, 1096 (2010)), logic would dictate that when conducting a balancing test, as the probative value decreases, the prejudicial impact inherent in other-crimes evidence increases in

- 34 -

its comparative weight to probative value. As the probative value of evidence decreases, the prejudicial impact inherent in other-crimes evidence weighs more in comparison. The dissent refers to the inmate request slips as "powerful evidence" tending to prove defendant's identity as the caller. In light of the fact the judge's clerk could tell the caller was defendant without any assistance and defendant giving the investigator, who recognized his voice as the caller, the same phone number as the "unknown caller," one could reasonably question just how "powerful" this additional evidence was. It would only be logical to conclude that, as the need for the evidence diminishes, the prejudicial impact increases and the balancing test would necessarily weigh in favor of refusing the evidence. It is a balancing test, after all. See *People v. Heard*, 187 Ill. 2d 36, 58, 718 N.E.2d 58, 71 (1999) ("Where other-crimes evidence is relevant for a permissible purpose, the trial court must still weigh the prejudicial effect of admitting the other-crimes evidence against its probative value."). The use of the jail slips had very little probative value for either identity or intent and thus was substantially prejudicial because there was nothing in the slips that lent itself to an inference they were indicative of defendant's state of mind at the time of the telephone call. Further, as we will discuss later, without the improper use of the inmate-request slips, the State could not have proved a "true threat," which exemplifies the substantial prejudicial impact. See *Watkins*, 2015 IL App (3d) 120882, ¶ 45 (reversal is required when "the erroneously admitted evidence must have been a material factor in the defendant's conviction such that without the evidence the verdict likely would have been different"). The dissent readily admits that, without this evidence as well as his inadmissible-for-evidentiary-purposes opening statement, defendant's conviction could not stand. Here, we find the court abused its discretion by admitting the evidence. As we have found error, we continue the analysis under the first prong of plain error.

¶ 69    Where a defendant claims first-prong plain error, a court of review must determine whether a defendant has shown the evidence was "so closely balanced that the error alone severely threatened to tip the scales of justice" by seeking to establish defendant's intent after the fact. *People v. Sebby*, 2017 IL 119445, ¶ 51, 89 N.E.3d 675. "Under the first prong of plain-error analysis, '[w]hat makes an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive.' " *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 71, 115 N.E.3d 1207 (quoting *Sebby*, 2017 IL 119445, ¶ 68). Therefore, if defendant meets his or her burden, prejudice is not presumed, but instead, the error itself is actually prejudicial. *Sebby*, 2017 IL 119445, ¶ 51.

¶ 70    In this case, the evidence on intent was closely balanced. The identity of the caller was not legitimately in dispute. In reality, the trial turned on defendant's intent. With the voicemail alone, the jury had an ambiguous statement with no other evidence indicating whether it was a "true threat" or not. The error in admitting the jail slips "threatened to tip the scales of justice against the defendant" (internal quotation marks omitted) (*Sebby*, 2017 IL 119445, ¶ 48) by seeking to establish defendant's intent after the fact. There was no evidence supporting the inference the slips were in relation to the telephone call and substantial evidence they were intended to address the situation then before the defendant. Much like *Dye*, the State failed to present any evidence to the jury from which they could conclude the inmate slips, written several months later, under substantially dissimilar circumstances, were somehow reflective of defendant's intent at the time of the telephone call. There is no question defendant was rude and insulting and had a very low opinion of the judge, which was reflected in both the voicemail and the inmate-request slips. However, he was charged with threatening a public official, which required evidence of a "true threat." The phone message contained no such threat, nor in reality,

did the inmate-request slips. Even if they did, they were not the offenses for which defendant was on trial. By admitting the slips, the court permitted the State to argue defendant's intent at the time of the inmate-request slips as indicative of his intent two months earlier, before he was charged and incarcerated. It was thus plain error for the court to admit the inmate-request slips into evidence.

¶ 71                              2. *Sufficiency of the Evidence*

¶ 72           Defendant also argues his conviction for threatening a public official should be reversed because the State failed to prove beyond a reasonable doubt defendant intended to communicate a "true threat" to Judge Bollinger. When considering the sufficiency of the evidence to convict a defendant of a crime, we will affirm the conviction if any *rational* trier of fact could have found the State *proved all the elements* of the crime *beyond a reasonable doubt*, viewing the evidence in a light most favorable to the prosecution. *People v. Hardman*, 2017 IL 121453, ¶ 37, 104 N.E.3d 372.

¶ 73           Based on this court's decision in *Dye*, the voicemail message alone would have been insufficient to convict defendant of threatening a public official. In *Dye*, the defendant was accused of threatening his attorney, a public defender, during a meeting at the public defender's office in the courthouse. *Dye*, 2015 IL App (4th) 130799, ¶ 3. During the meeting, the defendant became upset when his public defender told him she had subpoenaed some documents that inadvertently uncovered evidence harmful to his case and that the State would now be entitled to receive under the rules of discovery. *Dye*, 2015 IL App (4th) 130799, ¶¶ 3, 4. Apparently, the subpoenaed documents pertained to chemical tests performed on a crack pipe. *Dye*, 2015 IL App (4th) 130799, ¶ 3.

¶ 74           The defendant became angry and demanded his public defender have the crack

pipe retested. His attorney said no. Both the defendant and his attorney raised their voices in the exchange that followed. The defendant threatened to complain about the attorney to the trial judge and ask for a different attorney. The attorney told the defendant to go ahead but she doubted the judge would appoint a different attorney. The defendant then accused his attorney of working for the prosecutors and selling him out. The attorney told the defendant to leave her office. *Dye*, 2015 IL App (4th) 130799, ¶ 4. On his way through the waiting room, while pointing at both his attorney and the floor, the defendant said two or three times, " 'I'm gonna get you.' " *Dye*, 2015 IL App (4th) 130799, ¶ 5. The attorney then asked, " 'Are you fucking threatening me?' " *Dye*, 2015 IL App (4th) 130799, ¶ 5. The defendant responded, " 'No, no. I ain't threatening you.' " *Dye*, 2015 IL App (4th) 130799, ¶ 5. A male paralegal in the office stepped between defendant and the female attorney because of the defendant's mannerisms, aggressive speech, and posture. The defendant then left the office. *Dye*, 2015 IL App (4th) 130799, ¶ 5. The public defender, who was scared and near tears, called the police. *Dye*, 2015 IL App (4th) 130799, ¶ 6.

¶ 75        In reversing the defendant's conviction for threatening a public official, this court noted no witness had direct access to defendant's state of mind and his intent when he said, " 'I'm gonna get you.' " *Dye*, 2015 IL App (4th) 130799, ¶ 11. In this court's opinion, it did not appear the trier of fact was provided any evidence giving any context to the defendant's statement to his attorney other than what happened at that one meeting. *Dye*, 2015 IL App (4th) 130799, ¶ 12. This court's opinion noted the absence of any evidence of conveying a "true threat" or intent to commit violent retribution by the defendant toward his public defender. *Dye*, 2015 IL App (4th) 130799, ¶ 12. In addition, during that meeting, the defendant said he was going to complain about his public defender to the trial judge, which provided a reasonable

interpretation for his comment, " 'I'm gonna get you.' " *Dye*, 2015 IL App (4th) 130799, ¶ 4. Also, during the argument, the defendant denied he meant his statement as a threat to his public defender. *Dye*, 2015 IL App (4th) 130799, ¶ 5. Finally, this court noted tensions were high during this argument. Both the defendant and his public defender were yelling at each other. As a result, this court found there was no way to presume the defendant intended to be understood as making a physical threat. *Dye*, 2015 IL App (4th) 130799, ¶ 12. We found the defendant's threat "was ambiguous as to whether the intended meaning was violent or nonviolent retribution, and nothing about the context of the threat could reasonably resolve the ambiguity." *Dye*, 2015 IL App (4th) 130799, ¶ 1.

¶ 76    In *Goodwin*, 2018 IL App (1st) 152045, ¶ 5, the defendant, while sitting in the gallery of a courtroom, heckled a prosecutor as she was walking out of the courtroom following a hearing. The prosecutor responded, " 'between the two of us you are here on bond, so why don't you find a seat,' " to which the defendant took offense. *Goodwin*, 2018 IL App (1st) 152045, ¶ 5. The defendant followed the prosecutor out of the courtroom and kept screaming, " 'come back here and say that to my face.' " *Goodwin*, 2018 IL App (1st) 152045, ¶ 6. The sheriff was called, and the defendant was charged and convicted of threatening a public official. *Goodwin*, 2018 IL App (1st) 152045, ¶¶ 3, 7. On appeal, the First District held the appropriate test was "whether the State proved beyond a reasonable doubt that defendant intended his communication to [the recipient] to be a threat that a reasonable listener would understand to be threatening." *Goodwin*, 2018 IL App (1st) 152045, ¶ 42. The court found there was no evidence the defendant threatened the prosecutor when looking at the totality of the circumstances and it was more likely the defendant was seeking to report her because, according to several witnesses, he kept asking for her name. *Goodwin*, 2018 IL App (1st) 152045, ¶ 54.

¶ 77    From *Dye*, 2015 IL App (4th) 130799, ¶ 12, and *Goodwin*, 2018 IL App (1st) 152045, ¶ 54, it is clear a reviewing court should look at the totality of the circumstances to determine the subjective component of the analysis in ascertaining the intent of defendant. When reviewing *objectively* whether the communication constitutes a threat to inflict physical harm, the relationship of the parties may have some relevance, though the dissent cites no authority for this proposition.

¶ 78    In the voicemail, there is no explicit threat of violence. Even the clerk who first heard the message said that. The statement is ambiguous in the message it seeks to convey at worst, and at best, it relates defendant's belief Judge Bollinger is corrupt. Defendant stated Judge Bollinger "committed perjury," that he had "all the facts on that," and that Judge Bollinger will "be hearing from someone." In the voicemail, defendant's tone is relatively calm. Arguably, the comment in *Dye*, 2015 IL App (4th) 130799, ¶ 5, of " 'I'm going to get you,' " is more indicative of a violent threat and less ambiguous than what appears before us. While one can read the comment that "he'll be hearing from someone" as a threat, it is not a "true threat" in the context of *Black*. There is no "serious expression of an intent to commit an act of unlawful violence" with any intent that it be so construed by the listener. (Internal quotation marks omitted.) *Dye*, 2015 IL App (4th) 130799, ¶ 9 (citing *Black*, 538 U.S. at 359-60). Instead, the "threat" within the telephone message is to warn Judge Bollinger the caller is going to seek to have him investigated for perceived wrongs and that he is being given an opportunity to "reconsider," obviously referencing the recent dismissal of defendant's *mandamus* actions, especially in light of the fact Judge Bollinger dismissed the actions the day before the voicemail. To speculate a violent intent based solely on the statement was improper. "[T]he threat must be a 'true threat,' or else the prosecution would violate the first amendment ***." *Dye*, 2015 IL App (4th) 130799, ¶ 8.

¶ 79 The dissent contends the evidence of the trial court's dismissal of defendant's five *mandamus* petitions somehow constituted "additional evidence" of defendant's intent. However, in order to be relevant, this evidence needed to show defendant's intent to make a threat of *physical harm*. Instead, even defendant contended it was evidence of what he perceived as the court's corruption, necessitating his reporting of the matter and seeking prosecution.

¶ 80 Even assuming *arguendo* the inmate-request slips could have been admitted, as the dissent suggests, the voicemail still does not convey a "true threat."

¶ 81 In *Wood*, 2017 IL App (1st) 143135, ¶ 4, after having the trial judge deny his motion to terminate his probation or transfer, the defendant left a voicemail with his public defender. In the voicemail, he stated:

> "There is not a day that goes by since I was sentenced at that courthouse that I have not dreamed about revenge and the utter hate I feel for the judge, and the utter hate I feel for the prosecuting attorney, and the utter hate I feel for the corporation that bound me in chains. There's not a day that goes by that I don't pray for the death and destruction upon the judge and upon every single person who sentenced me ***." (Internal quotation marks omitted.) *Wood*, 2017 IL App (1st) 143135, ¶ 4.

The First District found the statement in part or in its entirety did not convey a "true threat" or an expression of intent to commit an act of unlawful violence to a particular individual. *Wood*, 2017 IL App (1st) 143135, ¶ 14. "A person expressing a dream for revenge is not the same as an expression that the person intends to undertake physical retaliation or commit violence." *Wood*, 2017 IL App (1st) 143135, ¶ 15. In that case, the State argued the circumstances around the call

showed the defendant intended to make a threat, citing the defendant admitted being upset, calling after hours from a blocked number, mentioning the judge by name, and not leaving his own name. *Wood*, 2017 IL App (1st) 143135, ¶ 16. The court stated that, while the context of the call may be unsettling, it did not transform it into a true threat. *Wood*, 2017 IL App (1st) 143135, ¶ 17. The defendant's statements were hypothetical and did not convey any intent to do anything. *Wood*, 2017 IL App (1st) 143135, ¶ 17.

¶ 82 The circumstances in *Wood* are similar to this case if the slips were properly admissible. In defendant's first slip on December 29, 2015, he wrote: "I'm going to prove you guilty of your fraudulent charge and corruption against me, and do my best to get you prosecuted. This is a fact, not a threat, you anti-American communistic piece of shit." Defendant then drew a middle finger and wrote "F U!" Defendant also cited Psalms 55:15 and 141:6 and Isaiah 40:23 without writing out the actual verses. According to defendant's Bible, Psalm 55:15 states, "Let death seize them. Let them go down alive into hell for wickedness. It is in their dwellings and among them." Psalm 141:6 states: "Their judges are overthrown by the sides of the cliff, and they hear my words, for they are sweet." Isaiah 40:23 reads: "He brings the princes to nothing. He makes the judges of the earth useless."

¶ 83 On January 7, 2016, defendant wrote another inmate-request slip, saying:

"Praise the Lord.

As my right to freedom of speech and my job to preach the word of the Lord as his servant, I'm sharing the word of the Lord with Judge Bollinger, due to his fraudulent charge against me, and because he defies the Lord of hosts, and due to his corruption he is being investigated for the purpose of prosecution and conviction.

- 42 -

I'm doing my best to help in the investigation. Praise the Lord."

After citing Psalm 144:19 but not writing out the verse, defendant wrote:

"All this writing is a fact, not a threat. You cocksucking piece of shit, so don't take it any other way unless it's up your ass, you fag. Hey Bollinger, if you like balls, I'd like to ball you up as a bowling ball and strike out the rest of make-up counties' judges and state's attorneys, then I'll make your ass a gutter ball. Talking about your mind being in the gutter, have you been to Play-Mor Lanes yet? I'm going[.] I'm going to striking [*sic*] out the entire corruption ring, I'm playing major league baseball man."

¶ 84    While defendant's statements were crude and clearly inappropriate to send to a judge, they reveal defendant's attitude about the judge and his intention to prove Judge Bollinger guilty of corruption. He says he is going to prove the judge "guilty of [the] fraudulent charge and corruption against [him] and do [his] best to get [Judge Bollinger] prosecuted." This language reveals no intent to cause physical injury, despite the dissent's assertions otherwise. Even if we were to interpret defendant's language as a threat, it was a threat to prove Judge Bollinger was complicit in a corruption scheme against defendant. The only references to either literal or figurative physical injury come from the biblical verses cited. In *Wood*, where the defendant prayed that God enact revenge on the judge for his sentence, the defendant stated what God would do but said nothing about being God's instrument to exact the punishment sought. Defendant here did not purport to be God or God's instrument to do anything but report the judge for perceived misdeeds and assist with his prosecution. See *People v. Peterson*, 306 Ill. App. 3d 1091, 715 N.E.2d 1221 (1999) (the court found the defendant guilty of intimidation,

- 43 -

ruling the defendant made a threat when the defendant wrote letters *as God* to three judges and witnesses stating he would kill them). If anything, defendant's inmate-request slips were defendant's efforts to convince Judge Bollinger to change his behavior or suffer the wrath of God as reflected in the scriptures. Defendant himself said he felt obligated to "preach the word" to Judge Bollinger and wanted him to know God does not look kindly on corruption.

¶ 85        The second message reads similarly. Defendant contends Judge Bollinger is being investigated and he is doing what he can to help the investigation. The bowling ball references are metaphorical at best and cannot be taken literally, even for this defendant. Defendant undoubtedly does not intend on "balling up" Judge Bollinger like a bowling ball but is using it as a metaphor to claim his intention to rid the county of the corruption of its public officials. Combining the slips and the voicemail, defendant believes he was wronged and there is a corrupt scheme to silence him, which he intends to expose. He neither states nor implies he plans to engage in physical violence to accomplish his goal but instead promises to have them investigated and prosecuted. As a result, under the clear language of the telephone message, without the inmate request slips, defendant did not convey a "true threat." Even if the inmate-request slips had been properly admitted, if anything, they revealed defendant's perceived obligation to "preach the Word of the Lord" to Judge Bollinger to prevent God from carrying out those things reflected in the chosen scriptural references. Without the slips, there is no basis for any rational fact finder to conclude the telephone message conveyed a "true threat" beyond a reasonable doubt, and his conviction for threatening a public official should be reversed.

¶ 86        As we have found the text of the inmate-request slips were not threatening and instead merely revealed defendant's intent to have Judge Bollinger prosecuted, it would appear the dissent has relied upon the text within the scriptural citations to ascertain defendant's intent

to convey a threat. However, the scriptural references by themselves without the text referenced by the citations or connected to defendant's intention to fulfill them are irrelevant. The verses have no probative value if the reader does not know what they say. Defendant merely cites scripture. The phrases "Psalms 55:15" or "Deuteronomy 32:30," for example, are not threatening and do not show an intent to inflict bodily harm nor could they put a reasonable person in fear of bodily harm. Without the connection of the verses to defendant or some indication of his intention to perform the acts referenced in the scriptures, there was nothing about the scriptural references alone that would constitute a "true threat." Thus, the citations to scripture bore no relevance to any issue in this case and were inadmissible on simple relevancy grounds.

¶ 87                                    B. Contempt of Court

¶ 88          Defendant next argues the trial court erred by summarily convicting him of direct criminal contempt in case Nos. 16-CC-1 and 16-CC-2. Criminal contempt of court is "conduct which is calculated to embarrass, hinder or obstruct a court in its administration of justice or derogate from its authority or dignity, thereby bringing the administration of law into disrepute." (Internal quotation marks omitted.) *People v. L.A.S.*, 111 Ill. 2d 539, 543, 490 N.E.2d 1271, 1273 (1986). Direct criminal contempt occurs in the presence of the court. *L.A.S.*, 111 Ill. 2d at 543. Before citing a person with contempt, "a court must find that the alleged contemnor's conduct was willful." *People v. Simac*, 161 Ill. 2d 297, 307, 641 N.E.2d 416, 421 (1994). An individual's "intent may be inferred from the surrounding circumstances and the character of the party's conduct." *Simac*, 161 Ill. 2d at 307.

¶ 89          Direct criminal contempt may be found and punished summarily if all the elements are before the court and within the judge's knowledge. *Simac*, 161 Ill. 2d at 306. Contempt may not be summarily imposed if the record shows a substantial question as to the

- 45 -

defendant's mental capacity to commit contempt. *People v. Willson*, 302 Ill. App. 3d 1004, 1006, 706 N.E.2d 1075, 1077 (1999). In that situation, a defendant must be given a hearing and a right to present a defense. *Willson*, 302 Ill. App. 3d at 1006.

¶ 90 Relying on *Willson* and *People v. Sheahan*, 150 Ill. App. 3d 572, 575-76, 502 N.E.2d 48, 51-52 (1986), defendant argues the trial court was on notice defendant might be mentally ill. Defendant argues:

> "The trial court noted [defendant's] behavior, when it discussed the possibility of 'fresh concerns' as to a *bona fide* doubt as to his fitness. [Citation.] The court even noted Smith's potential for outbursts, asking him to 'keep [his] voice down, *** calm down,' and not use terms like 'BS,' or 'freaking.' [Citation.] Furthermore, the court was aware that Smith had a long history of mental illness, including psychiatric commitment 'on two occasions after he was found unfit to stand trial.' [Citation.] Finally, the court even discussed the same factor it listed when finding a *bona fide* doubt existed before ordering an evaluation."

¶ 91 The State disagrees, contending there were not sufficient facts in the record to put the trial court on notice defendant did not or might not have the mental capacity to commit contempt. We agree with the State.

¶ 92 The situation in this case is distinguishable from both *Willson* and *Sheahan*. In *Willson*, the trial court found the defendant in direct criminal contempt of court for his behavior during a fitness hearing being conducted at the request of the defendant's attorney. *Willson*, 302 Ill. App. 3d at 1005. After finding the defendant in contempt, the court granted defense counsel's

motion for a fitness evaluation and later ruled the defendant was unfit to stand trial. *Willson*, 302 Ill. App. 3d at 1005. In *Sheahan*, the defendant was found guilty but mentally ill of direct criminal contempt at his arraignment. *Sheahan*, 150 Ill. App. 3d at 573. The court ordered the defendant to be sentenced to the Department of Corrections (DOC) and requested DOC transfer the defendant to the Department of Mental Health for any necessary mental-health treatment. *Sheahan*, 150 Ill. App. 3d at 574.

¶ 93    Neither the defendant in *Willson* nor the defendant in *Sheahan* had already undergone a fitness evaluation and been found fit like defendant in this case. The psychiatrist who evaluated defendant and opined he was fit to stand trial noted defendant would likely file bizarre motions and interrupt the court proceedings and believe he was perfectly justified in doing so. In addition, defendant was able to control his behavior, as evidenced by his conduct during *voir dire* and his trial. Based upon the record, defendant had the mental capacity to understand what he was doing when he engaged in the conduct for which the trial court held him in contempt. As a result, the court did not err in summarily finding defendant in contempt of court on either occasion.

¶ 94             C. Other Issues

¶ 95    As a result of our ruling, we need not address defendant's arguments regarding (1) the constitutionality of section 12-9(a) of the Criminal Code (720 ILCS 5/12-9(a) (West 2014)) as being overbroad as written, (2) a speedy trial violation, (3) the trial court allowing defendant to proceed *pro se*, and (4) defendant's lack of fitness.

¶ 96           III. CONCLUSION

¶ 97    For the reasons stated, we affirm defendant's convictions and sentences for direct criminal contempt and reverse defendant's conviction for threatening a public official. As part of

our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. See 55 ILCS 5/4-2002(a) (West 2016).

¶ 98        Affirmed in part and reversed in part.

¶ 99        JUSTICE TURNER, dissenting:

¶ 100        I respectfully dissent. A rational trier of fact could have found defendant left the voicemail message for Judge Bollinger, defendant intended to make a "true threat" toward Judge Bollinger, and the threat could have placed a reasonable person in Judge Bollinger's position in reasonable apprehension of immediate or future bodily harm. A statement constitutes a "true threat" when the speaker "means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359. The speaker need not intend to carry out the threat for the threat to constitute a "true threat." *Black*, 538 U.S. at 359-60.

¶ 101        The threat in this case was left in a voicemail message for Judge Bollinger. This message was not a poorly worded motion to reconsider as the majority suggests. Defendant did not leave his name, contact information, or any specific information regarding any particular legal matter. In addition, defendant called Judge Bollinger a "cock-sucker" and a "corrupt son of a bitch." He also accused Judge Bollinger of committing perjury.

¶ 102        After insulting Judge Bollinger and accusing him of misconduct, defendant stated:

"So uh, uh, I'm sure he'll be hearing more from someone so alright

… I was just trying to give him, you know, another chance to, uh,

you know, reconsider, while he's, he's got a chance to so, I was uh,

yeah, you know, trying to do something correct, trying to go about

things legally to get some things taken care of, for which he was

- 48 -

obviously trying to cover up, so I'll take it from there … so

alrighty, thank you … bye-bye."

¶ 103     Based on the message alone, a rational trier of fact could easily conclude whoever left the message was very upset with Judge Bollinger because the caller believed Judge Bollinger was corrupt and would not allow the caller to resolve his unspecified problem in a legal manner.

¶ 104     I agree defendant's conviction could not stand if the voicemail message was the only evidence the State presented. However, the State presented additional evidence— defendant's five *mandamus* petitions the trial court dismissed with prejudice—of defendant's attitude toward law enforcement, the state's attorney, and Macon County's legal system in general. *Supra* ¶¶ 20-26. Defendant does not dispute this evidence. Instead, as the majority notes, defendant's theory of the case as outlined in his opening statement was that this evidence would prove Judge Bollinger's guilt and defendant's innocence. *Supra* ¶ 16.

¶ 105     As the majority stated, the context in which a statement was made is important in determining whether an alleged threat constitutes a "true threat." *Supra* ¶ 53. As a result, the analysis used to determine whether a communication is a "true threat" does not end with the actual language used in the communication. The relationship between the person making the alleged threat and the individual at which the alleged threat was directed is relevant among other things to show the defendant's intent in making a statement and the explicit and/or implicit meaning behind the words he chose to use. The exact same language can have vastly different meanings depending on the relationship of the individuals involved.

¶ 106     Unlike in *Dye*, the jury in this case had sufficient contextual evidence for it to find defendant intended to communicate a serious expression of an intent to commit an act of unlawful violence on Judge Bollinger. The jury heard defendant believed law enforcement

officials in Macon County and other county employees were corrupt. The jury also knew Judge Bollinger dismissed with prejudice defendant's complaints against these individuals. Defendant left the anonymous message at issue in this case the day after Judge Bollinger dismissed his claims with prejudice. Defendant stated he had tried to solve his issues legally but was now going to handle the matters himself because of Judge Bollinger's corruption. In the message, he stated Judge Bollinger would be hearing from someone if he did not reconsider some unspecified decision while he had the chance.

¶ 107 The jury also heard additional evidence regarding defendant's feelings toward Judge Bollinger in the form of the inmate request slips. The majority holds the trial court clearly abused its discretion in admitting these inmate request slips. I disagree.

¶ 108 According to our supreme court, we should only reverse a trial court's ruling admitting evidence of other crimes or other bad acts if the court clearly abused its discretion. *Peterson*, 2017 IL 120331, ¶ 125. "The question is not whether the reviewing court would have made the same decision if it were acting as the trial court. Rather, the question is whether the trial court's decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *Peterson*, 2017 IL 120331, ¶ 125 (quoting *People v. McDonald*, 2016 IL 118882, ¶ 32, 77 N.E.3d 26). The trial court's ruling to admit the inmate request slips in this case was not so fanciful, arbitrary, or unreasonable that no reasonable court would agree with the decision.

¶ 109 In my view, the messages on the inmate request slips were sufficiently similar to the voicemail message left for Judge Bollinger. See *People v. Illgen*, 145 Ill. 2d 353, 372, 583 N.E.2d 515, 523 (1991) (the other bad act must also have "some threshold similarity to the crime charged" to be admissible). Both the voicemail message and the messages in the inmate request

slips were directed at Judge Bollinger, called him obscene names, included hateful language and an ominous tone, and accused the judge of corruption. Further, both the voicemail message and the inmate request slips were linked to defendant. The caller who left the voicemail message used defendant's telephone line, and the inmate request slips came from defendant's cell at the county jail.

¶ 110 Not only were the messages on the inmate request slips sufficiently similar to the voicemail message, the messages on the inmate request slips were also relevant for a purpose other than showing defendant's propensity to commit crime. See *Illgen*, 145 Ill. 2d at 364-65 (evidence of other bad acts is admissible if relevant for a purpose other than demonstrating a defendant's propensity to commit crime). "Evidence is considered 'relevant' if it has any tendency to make the existence of any fact that is of consequence to the determination of an action more or less probable than it would be without the evidence." *Illgen*, 145 Ill. 2d at 365-66. The messages on the inmate request forms tended to make it more likely defendant left the message and intended to communicate a serious expression of defendant's intent to commit an act of unlawful violence on Judge Bollinger.

¶ 111 The messages in the inmate request slips included citations to Bible verses, which could be interpreted as justifying violence in general and violence against a person's enemies— judges in particular. Defendant saw the legal system in Macon County and Judge Bollinger in particular as his enemy. Defendant went so far as to refer to Macon County in some of his court filings as "Make-Up" County. He even refused to accept the appointment of a public defender because the trial court would appoint the Macon County Public Defender's Office, which he believed was biased against him based on the way they represented him in prior cases.

¶ 112 One of the inmate request forms referenced Psalm 141:6, which states: "Their

judges are overthrown by the side of the cliff, and they hear my words, for they are sweet." The note also cited Isaiah 40:23, which states: "He brings the princes to nothing. He makes the judges of the earth useless." The message on the other inmate request form cited Deuteronomy 32:41-42, which reads: "If I whet my glittering sword and my hand takes hold on judgment; I will render vengeance to my enemies and repay those who hate me. I will make my arrows drunk with blood, and my sword shall devour flesh; with the blood of the slain and the captives from the heads of the leaders of the enemy." The message also cited Amos 2:3, which stated: "And I will cut off the judges from its midst, and slay all its princes with him, says the Lord."

¶ 113    The inmate request slips were also relevant to establish defendant's identity as the individual who left the voicemail message for Judge Bollinger. While the State had evidence whoever left the voicemail message had used defendant's telephone line, defendant denied he made the call. As a result, the State had to prove defendant's identity as the caller. The fact defendant wrote the messages on the inmate request forms to Judge Bollinger made it more probable defendant—and not someone else using his telephone—left the voicemail message.

¶ 114    The majority first states the prosecution did not need these inmate request slips to establish defendant's identity because it had other evidence establishing his identity as the person who left the voicemail message. Later, the majority explains that "[a]s the probative value of evidence decreases, the prejudicial impact inherent in other-crimes evidence weighs more in comparison." *Supra* ¶ 68. However, I disagree with the majority's premise that the existence of other potential evidentiary avenues to prove defendant's identity reduced the probative value of the slips. The slips were powerful evidence tending to prove defendant was the person who left the telephone message for Judge Bollinger. Thus, I do not agree the trial court abused its discretion by allowing this evidence to establish defendant's identity despite the strength of the

rest of the State's evidence on that element. As such, the prejudicial effect of this evidence did not substantially outweigh its probative value.

¶ 115        Based on the evidence in this case, a rational trier of fact could have determined defendant believed he was justified in committing an act of physical violence on Judge Bollinger. The jury could have easily concluded defendant was telling Judge Bollinger he was going to handle this matter outside the judicial system where Judge Bollinger's authority as a judge would provide him no protection against a physical assault by defendant or someone on defendant's behalf. After all, it would make little sense for someone who believed Judge Bollinger was corrupt to then ask the same judge to reconsider his earlier decision based on defendant's legal arguments alone.

**No. 4-16-0641**

| | |
|---|---|
| **Cite as:** | *People v. Smith*, 2019 IL App (4th) 160641 |
| **Decision Under Review:** | Appeal from the Circuit Court of Macon County, Nos. 15-CF-1335, 16-CC-1, 16-CC-2; the Hon. Karle E. Koritz, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Jacqueline L. Bullard, and Sonthonax B. SaintGermain, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and John M. Zimmerman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |